IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
May 23, 20000 Session

## STATE OF TENNESSEE v. GERALD LEANDER HENRY

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 92-D-2010     Seth W. Norman, Judge**

------------------

**No. M1995-00005-SC-R11-CD - Filed December 21, 2000**

------------------

We granted this appeal to determine whether the trial court erred in admitting statements made by the co-defendant following the arrest of the defendant and the co-defendant for first-degree murder, attempted first-degree murder and related offenses. The Court of Criminal Appeals concluded that although the conspiracy to commit the offenses had ended, the co-defendant's statements were made during the course of and in furtherance of a separate conspiracy to conceal the offenses and were admissible pursuant to the co-conspirator exception to the hearsay rule set out in Tenn. R. Evid. 803(1.2)(E).  After reviewing the record, we conclude that the co-defendant's statements were made after the conspiracy had ended and, therefore, were not admissible under Tenn. R. Evid. 803(1.2)(E). We further conclude, however, that the error was harmless, and we affirm the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of**
**Criminal Appeals affirmed.**

E. RILEY ANDERSON, C. J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, ADOLPHO A. BIRCH, JR., AND JANICE M. HOLDER, JJ., joined.  WILLIAM M. BARKER, J., not participating.

Jeffrey A. DeVasher, David M. Siegel, and Hollis I. Moore, Jr., Assistant Public Defenders, Nashville, Tennessee, for the appellant, Gerald Leander Henry.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Daryl J. Brand, Associate Solicitor General; Victor S. Johnson III, District Attorney General; and Kymberly Haas, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# BACKGROUND

On July 16, 1992, the victims, William Weaver and Larry Harrington, were installing alarms in a church dormitory while working for a security firm in Nashville, Tennessee. Weaver was eating lunch inside a van in the church parking lot when the van was approached by the defendant, Gerald Leander Henry, and a co-defendant, Sean O'Brien. O'Brien removed a pistol from a duffel bag and ordered Weaver from the van and into the dormitory where they encountered Harrington.

Once inside the dormitory, Weaver and Harrington were ordered to lie on the floor face down. Henry bound Harrington's hands and feet with wire. Harrington heard a crash, followed by Weaver moaning. Henry then tied Weaver's hands and feet. O'Brien fired three shots, striking each victim once in the back of the head. Weaver was killed. Harrington miraculously survived, managed to free himself, and called 911 for help. Harrington was hospitalized for 13 days and was treated for serious, life-threatening injuries. Harrington had "no doubt" that Henry and O'Brien were the men who had committed the crimes and later testified as to the foregoing facts at trial and identified Henry.

After the shootings, O'Brien and Henry fled from the scene in the victims' van. When spotted by law enforcement officers near Jackson, Tennessee, O'Brien, who was driving the van, attempted to outrun the officers. Driving at speeds of up to 100 miles per hour, he ran a red light, forced vehicles off the road, and evaded a police road block. When the van was finally stopped, Henry got out of the vehicle and complied with officers' commands. O'Brien refused to surrender and had to be pulled from the van by officers.

Following his arrest, Henry was advised of his <u>Miranda</u> rights and made a voluntary confession. He told officers that he met O'Brien only a day or two before the shootings and that they intended to go to California together but did not have a vehicle. When they approached the white van in the church parking lot, O'Brien used a .45 caliber pistol to force the victim out of the van. Henry told officers that he did not know O'Brien had a pistol. Henry admitted that once inside the dormitory, he tied and bound the victims before O'Brien shot them. Henry further stated that he did not know that O'Brien was going to shoot the victims. He admitted, however, that once he and O'Brien fled from the scene in the victims' van and were being pursued by police, he threw the .45 caliber pistol out of the van. Henry later accompanied officers to the location where the gun had been discarded.

After Henry and O'Brien were both arrested and after Henry had made his statement to police, they were placed together in the same interview room. A hidden camera and recording device had been installed in the room in order to videotape and record their conversation. Henry and O'Brien had a 27-minute conversation, a large portion of which was whispered or was otherwise unintelligible on the videotape. At several points, both O'Brien and Henry looked around the room and under the table and chairs, as if looking for a hidden microphone.

The audible portions of the videotape are summarized as follows:  Early in the conversation, O'Brien stated that he did not intend to shoot anyone; that the gun went off because he was nervous and scared; and that he was "sticking with his story" that the van, which he stole, already had the keys in it.  O'Brien told Henry, "Don't worry; I'm not going to say you did it. . . . I don't want you to do it to me."  After asking what Henry had told the police, O'Brien said, "Don't say anymore. . . .[Y]ou didn't see what happened."  Henry appeared to say that he would be quiet.  O'Brien reiterated that Henry had heard shots but did not see what happened.  Henry replied that he "wished he had dreamed it" but that the police had found the gun.

The discussion then turned to the evidence and other matters.  O'Brien said that Henry's fingerprints were on the gun, and Henry agreed.  O'Brien mentioned the death penalty and indicated his belief that only a few states, including Tennessee, used the death penalty.  O'Brien recounted that he had a history of mental illness and asked if Henry did as well.  Henry appeared to respond in the affirmative.  O'Brien speculated that his mental illness might prevent a charge of first-degree murder.  O'Brien said that he had been charged with first-degree murder, attempted first-degree murder, and assault with a vehicle, but he denied that he intended to run over any police officers when evading the roadblock.

At this point in the conversation, O'Brien told Henry, "Don't tell 'em anything I did; just tell 'em stuff that you did, okay?"  O'Brien added,

> I'm not going to say anything you did.  Only the stuff I did, 'cause that's all they're worried about. They're not worried about what you did.  You can tell 'em your story. . . . You don't have to say 'Sean did this.'

Henry appeared to nod in response but did not respond audibly.  O'Brien concluded, "This way we don't get ourselves in trouble. Or we get ourselves in trouble, and I give it to you, you give it to me. I'm already looking at twenty to forty years. . . ."

After several inaudible or unintelligible moments, the conversation returned to the offenses.  O'Brien said that the surviving victim untied himself and called the police.  He then said that he should have tried to evade the police at the last roadblock.  O'Brien told Henry, "All we wanted was the car . . ., you know that."  Then he added, "I don't even know why I did that."  O'Brien discussed the number of shots that had been fired and said that he "didn't even look" and "didn't want to look."  He then demonstrated that he looked away as he fired shots at the victims.  O'Brien wondered aloud what the victim's family was doing and then referred to himself as a "cold-blooded killer."  He reiterated that the "gun went off" because he was "scared." When Henry indicated that they "could have left [the gun] there," O'Brien responded that the police would have found it.  Near the conclusion of the conversation, Henry stated, "We got our story together."  O'Brien once again said that Henry did not have to mention his name.  The videotape concludes with O'Brien stating, "You know they're listening."

-3-

The videotaped conversation was to be offered as evidence by the State against defendant Henry at trial. Henry's counsel moved to exclude the videotaped statement prior to trial, arguing, among other grounds, that O'Brien's statements were inadmissible hearsay. The prosecution argued that the videotape, including the statements made by O'Brien, were admissible under Tennessee Rule of Evidence 803(1.2)(E), the "co-conspirator" exception to the rule excluding hearsay statements. The trial court admitted the entire videotape after concluding that "the conspiracy had not ended at that point in time."

The jury convicted Henry of first-degree felony murder, attempted first-degree premeditated murder, especially aggravated kidnapping, especially aggravated robbery, and two counts of especially aggravated burglary. Henry received a life sentence for first-degree felony murder, 20 years for attempted first-degree premeditated murder, 20 years for especially aggravated kidnapping, 20 years for especially aggravated robbery, and 10 years for each especially aggravated burglary. The sentences were to be served concurrently to one another but consecutively to the life sentence, for an effective sentence of life plus 20 years.

On appeal, the Court of Criminal Appeals reduced one of the convictions for especially aggravated burglary to aggravated burglary, but affirmed the remaining convictions and sentences. The court held that although the original conspiracy between Henry and O'Brien ended upon their arrest, O'Brien's statements were made during a separate conspiracy to conceal the crimes they had already committed and were, therefore, admissible pursuant to Tenn. R. Evid. 803(1.2)(E).[1]

We granted this appeal to address the application of Tenn. R. Evid. 803(1.2)(E), the co-conspirator exception to the hearsay rule, and to determine whether the trial court abused its discretion in admitting the statements made by O'Brien during the videotaped conversation between Henry and O'Brien.

## ANALYSIS

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A hearsay statement is not admissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802.

There are numerous exceptions to the hearsay rule, however, where statements that constitute hearsay bear sufficient indicia of reliability and trustworthiness to warrant admission. See Neil P. Cohen et al., Tennessee Law of Evidence, § 801.1, at 490-91 (3rd ed. 1995). The exception at issue in this case is that of "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." See Tenn. R. Evid. 803(1.2)(E). The rationale for this exception is

---

[1] The Court of Criminal Appeals also correctly held that Henry's statements on the videotape were properly admitted as a party's own admissions. See Tenn. R. Evid. 803(1.2)(A). Henry does not contest this ruling on appeal.

the principle of agency, under which each conspirator is bound to the actions and statements made by other conspirators during the course of and in furtherance of a common purpose. See Tennessee Law of Evidence, § 803(1.2).6, at 521.

Accordingly, for a statement to be admissible under this exception, the prosecution must establish: 1) that there is evidence of the existence of a conspiracy and the connection of the declarant and the defendant to that conspiracy; 2) that the declaration was made during the pendency of the conspiracy; and 3) that the declaration was made in furtherance of the conspiracy. See Tennessee Law of Evidence, § 803(1.2).6, at 521-22. These requirements must be established by a preponderance of evidence. See State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993).

The dispositive issue in this case concerns the second requirement: whether O'Brien's statements were made during the course of the conspiracy with Henry. On appeal, Henry contends that O'Brien's statements were made *after* the conspiracy had ended, inasmuch as he and O'Brien had been arrested for the offenses and he (Henry) already had confessed his involvement in the crimes. The State maintains that O'Brien's statements were admissible because a conspiracy under Rule 803(1.2)(E) includes declarations made by conspirators regarding concealment of the offenses.[2]

This Court discussed the "co-conspirator" exception in State v. Walker, 910 S.W.2d 381 (Tenn. 1995). In that case, the defendant was convicted of murder and robbery and argued on appeal that the trial court had erred in admitting statements made by co-conspirators after the offenses had occurred. We said that "a conspiracy is, in general terms, a combination of two (2) or more persons, by concerted action, to accomplish some criminal or unlawful purpose." Id. at 384. In discussing the scope of Rule 803(1.2)(E), this Court said:

> For a statement of the co-conspirator to be admissible it must have been made "during the course of" the conspiracy which means that the conspiracy must have been ongoing at the time the statement was made. If the conspiracy had not yet begun or had ended when the statement was made, the declaration is not admissible under this hearsay exception, although it may still be admissible under some other exception . . . .

State v. Walker, 910 S.W.2d at 385 (emphasis added).

Our analysis in Walker was predicated upon several early decisions of the Tennessee Supreme Court. In Owens v. State, the Court stated the general rule that "[a]ll acts or declarations of conspirators, or of any of them, may be given in evidence against all, from the time the conspiracy

---

[2] The State maintains that this is a general rule followed by numerous jurisdictions. See, e.g., State v. Flores, 595 N.W.2d 860, 866 (Minn. 1999); People v. Thomas, 687 N.E.2d 892, 902 (Ill. 1997); State v. Cornell, 842 P.2d 394, 398 (Or. 1992); Duffy v. State, 416 S.E.2d 734, 735-36 (Ga. 1992); State v. Pizzella, 723 S.W.2d 384, 388 (Mo. 1987); Spears v. State, 660 S.W.2d 913, 918 (Ark. 1983).

had its origin until its design has been consummated, or until it is abandoned." 84 Tenn. 1 (1885). Similarly, in Sweat v. Rogers, the Court stated:

> Care must be taken that the Acts and Declarations thus admitted be those only which were made and done during the pendency of the criminal enterprise and in furtherance of its objects. If they took place at a subsequent period, and are therefore merely narrative of past occurrences, they are, as we have just seen, to be rejected.

53 Tenn. 117, 120 (1871) (emphasis added) (citation omitted); see Snowden v. State, 66 Tenn. 482 (1874) ("[W]hen the common purpose is at an end, whether by accomplishment or abandonment, no one of the conspirators is permitted by the subsequent act or declaration of his own to affect the others.").[3]

Applying these rules to the facts in Walker, we carefully reviewed the facts and circumstances of three statements that had been admitted by the trial court on the basis that they pertained to concealment. We concluded that the statements had been made after the commission of the offenses and were not made in the course of or in furtherance of the conspiracy. See State v. Walker, 910 S.W.2d at 385-86. We also observed that one of the statements was merely a "narrative" statement of past conduct that was not made in the course of and in furtherance of the conspiracy. Id. at 386. We held, however, that the error in admitting these statements was harmless in light of the overwhelming evidence of the defendant's guilt. Id. at 387-88.

In our view, Walker clearly stands for the proposition that there is no bright-line test or precise definition for determining whether a statement has been made during the course of the conspiracy. The commission of the offense that was the goal of the conspiracy does not necessarily end the conspiracy, nor does it preclude the possibility that the conspiracy encompassed later statements regarding concealment of the offense. See State v. Walker, 910 S.W.2d at 385.[4] At the same time, the commission of the offense also does not imply that the conspiracy automatically included all later statements pertaining to the concealment of the offense. See State v. Walker, 910 S.W.2d at 386.

---

[3] Given our discussion of these principles in Walker as they relate to the application of the evidentiary rule, we agree with the Court of Criminal Appeals' conclusion, as do both the defendant and the State, that the statutory offense of conspiracy does not control the application of the evidentiary rule. Indeed, the statute provides that "[n]othing in this provision is intended to modify the evidentiary rules allowing statements of co-conspirators in furtherance of a conspiracy." Tenn. Code Ann. § 39-12-103(g).

[4] As the parties observe, we stated in Walker that Tenn. Code Ann. § 39-12-103 "totally abrogated" the statement in State v. Crabtree, 655 S.W.2d 173 (Tenn. Crim. App. 1983), that "a conspiracy may continue after the crime has been completed for, among other things, the concealment of the crime or to prevent witnesses from testifying." State v. Walker, 910 S.W.2d at 385. We clarify this statement to mean only that the definition alone does not control the evidentiary issue of whether a statement has been made during the course of the conspiracy.

The United States Supreme Court has also concluded that there are limits in determining whether a statement has been made during the course of a conspiracy. In Krulewich v. United States, the Court rejected the argument that accomplishment of the initial criminal objectives of a conspiracy implicitly resulted in a "subsidiary phase" of the conspiracy for the purpose of concealment. 336 U.S. 440, 443, 69 S. Ct. 716, 718, 93 L. Ed. 790 (1949); see also Lutwak v. United States, 344 U.S. 604, 618, 73 S. Ct. 481, 489, 97 L. Ed. 593 (1953) ("[T]he declarations of a conspirator do not bind the co-conspirator if made after the conspiracy has ended."). In short, the commission of the offense does not imply an agreement to conceal the offense, given the risk that after the commission of the crimes, each co-conspirator may act in his or her self-interest. In such circumstances, where there is no longer a common purpose, statements may lack the reliability that serves as the basis for the "co-conspirator" exception.

Accordingly, in the absence of a bright-line test, we conclude that Tenn. R. Evid. 803(1.2)(E) requires that a court examine all of the factors and circumstances of the case. The Supreme Court of Minnesota stated:

> Generally, a conspiracy to conceal the commission of the charged crime may not be automatically implied to permit the use of hearsay statements made by co-conspirators. . . . [T]he court should analyze the facts of the case to determine if in fact there was an agreement to conceal, to determine the closeness in time of the concealment to the commission of the principal crime, and to determine the reliability of these statements.

State v. Buschkopf, 373 N.W.2d 756, 764 (Minn. 1985). A court must keep in mind that the purpose of the rule is to ensure the reliability and trustworthiness of the statements sought to be admitted.

In this case, after the victims had been shot, Henry and O'Brien fled from the scene in the victims' van. They traveled west from Nashville to Jackson, Tennessee, which was consistent with Henry's statement that they had stolen the van to go to California. When the van was spotted by law enforcement officers, O'Brien drove the van at high speeds and evaded a roadblock in an effort to avoid apprehension. In the midst of the chase, Henry threw the murder weapon out of the van. It is obvious that Henry and O'Brien at this point were still acting in furtherance of a common purpose and that statements made by either of them at that time likely would have been during the course of the conspiracy.

The videotaped conversation between O'Brien and Henry, however, occurred approximately seven hours after they were arrested and nine hours after the offenses were committed. The State maintains that the conspiracy was ongoing because O'Brien and Henry discussed the offenses, the versions they could tell police, and ways to minimize their culpability. By that time, however, both Henry and O'Brien had been arrested and charged with the offenses. Moreover, Henry already had

given a confession to officers in which he admitted his involvement in the shooting of the victims; in the robbery of the van; in the flight from the scene; and also his disposal of the weapon. Henry had also led police officers to recover the weapon that he had thrown from the van when attempting to elude police.

The State nonetheless asserts that the statements were reliable because both Henry and O'Brien were the participants in the conversation. Our review reveals, however, that the videotaped conversation was dominated by O'Brien and consisted almost entirely of his statements and his concern that Henry not tell the police what he, O'Brien, had done. O'Brien repeatedly remarked on his participation in the crimes and the potential punishment he faced as the shooter of the victims. O'Brien said several times that Henry did not have to use O'Brien's name and did not have to tell officers what O'Brien had done. Although O'Brien stated that he, in turn, would not tell the police what Henry had done, it is significant that Henry had already confessed. Moreover, although Henry appeared to respond to O'Brien in the affirmative a few times, the vast majority of Henry's responses are inaudible or unintelligible.

We do not disagree with the State's contention that a conspiracy may extend to statements concerning the concealment of the offenses.[5] None of the cases cited by the State, however, involve facts similar to the present case. At the time of the videotaped conversation Henry and O'Brien had already committed the offenses, fled the scene, and eluded the police. Both had been arrested and charged for the offenses. Finally, Henry had already confessed to his involvement and had assisted the police in recovering the weapon. Indeed, several of the cases cited by the State stress these very types of distinctions in determining whether statements regarding concealment were made during the course of the conspiracy. See State v. Flores, 595 N.W.2d 860, 866 (Minn. 1999) (statements were made after the offense but before discovery of the crime or arrests); People v. Torres, 687 N.E.2d 892, 902 (Ill. 1997) (statements were made after the offense but before disposal of the murder weapon).

Accordingly, we hold that O'Brien's statements were made after the conspiracy had ended and, therefore, were not made during the course of the conspiracy as required for admissibility under Tenn. R. Evid. 803(1.2)(E). In our view, a finding that a conspiracy still existed and that the statements were made during the course of the conspiracy under the facts of this case would stretch Rule 803(1.2)(E) beyond its intended scope and would not ensure that statements admitted under this hearsay exception bear sufficient indicia of reliability. In simply concluding that the conspiracy was

---

[5] In fact, neither the defendant nor the State in this case argued in favor of the "second-conspiracy" approach used by the Court of Criminal Appeals. We agree that such a distinction is artificial and not helpful as it begs the issue of whether statements made during an alleged "second conspiracy" may be used to prove the charged offenses. Moreover, our analysis in Walker indicated that even if a separate conspiracy to conceal was said to exist, the statements made during the course of such a conspiracy are not admissible for that purpose. See State v. Walker, 910 S.W.2d at 386.

-8-

ongoing without considering the scope and purpose of the rule, the trial court abused its discretion in admitting O'Brien's statements.[6]

Having concluded that the trial court erred, we, however, agree with the Court of Criminal Appeals' conclusion that the error was harmless under the facts of this case. The substance of O'Brien's statements regarding the offense was established at trial through other means. Moreover, Henry's own confession detailed his association with O'Brien; his involvement in the robbery and the shootings; his flight from the scene with O'Brien after the shootings; and his disposal of the murder weapon while fleeing from the police. Finally, the surviving victim identified Henry and described his role in the offenses.

Henry nonetheless argues that the videotaped statements were used to link him to O'Brien, the "cold-blooded" killer, and that this prejudiced his defense that he lacked the intent to commit the crimes and was merely a facilitator of the offenses. There was no question, however, regarding Henry's role in the offenses. Henry fully participated in the robbery and the shootings. He tied and bound both victims before they were shot. He fled the scene with O'Brien in the stolen van, and he disposed of the weapon as they tried to elude police. The videotape reflects that O'Brien did nearly all of the talking, repeatedly incriminating himself as the shooter and suggesting ways in which Henry could minimize O'Brien's role. In contrast, Henry's responses were often inaudible or unintelligible. The videotape gives support to Henry's defense, inasmuch as O'Brien appeared to be the leader in the offenses. When viewed against the evidence of Henry's guilt, we conclude that the error was harmless and does not constitute reversible error.

## CONCLUSION

We conclude that under the circumstances of this case, the co-defendant's statements were not made during the course of the conspiracy and that the prosecutor failed to establish a foundation for the admission of the statements pursuant to the co-conspirator exception in Tenn. R. Evid. 803(1.2)(E). We further conclude that the error was harmless. Accordingly, we affirm the judgment of the Court of Criminal Appeals. It appearing that the appellant is indigent, costs of the appeal shall be taxed to the State.

_____
RILEY ANDERSON, CHIEF JUSTICE

---

[6] The State does not argue that a foundation for admissibility was established through some other exception.