IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 17, 2003

## STATE OF TENNESSEE v. JOHNNY LEE LEWIS

**Direct Appeal from the Criminal Court for Putnam County**
**No. 01-0401B     John A. Turnbull, Judge**

_____

**No. M2002-01350-CCA-R3-CD - Filed October 21, 2003**

_____

The defendant appealed his convictions on two counts of facilitation of second degree murder and one count of aggravated arson, as well as the effective 65-year sentence. The defendant's appeal raised the following issues: insufficiency of evidence to support the convictions; error in allowing hearsay testimony under the conspiracy exception; error in allowing cross-examination of the defendant during limited purpose jury-out hearing; error in allowing a medical expert to testify outside his area of expertise; failure to instruct the jury on inadequate crime scene investigation; and error in application of "particularly vulnerable" enhancement factor during the sentencing phase. We conclude that the defendant's issues are without merit and affirm the convictions and sentence as imposed by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Larry M. Warner, Crossville, Tennessee, for the appellant, Johnny Lee Lewis.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Clement Dale Potter, District Attorney General; and Larry G. Bryant, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case involves the murder of Delores Diane Watts; her ten-year-old daughter, Jessica Watts; and her daughter's overnight guest, thirteen-year-old Chelsie Smith.[1] The murder occurred in Ms. Watts' residence. The three victims were beaten with a baseball bat and/or a torque wrench. The house was then intentionally set ablaze with the use of gasoline. Diane Watts died from the

_____

[1] The indictment spells the name as "Chelsie" and such will be used herein, although the transcript uses the spelling, "Chelsea."

blunt force trauma, but the two minors' death was from smoke inhalation. The defendant, Johnny Lee Lewis, and co-defendants were indicted on the following counts:

1. Doug Myers and the defendant for the first degree murder of Diane Watts;
2. Doug Myers and the defendant for the first degree murder of Jessica Watts;
3. Doug Myers and the defendant for the first degree murder of Chelsie Smith;
4. Doug Myers and the defendant for the felony murder of Jessica Watts;
5. Doug Myers and the defendant for the felony murder of Chelsie Smith;
6. Doug Myers and the defendant for aggravated arson; and
7. Clementine Myers and Gary Myers for criminal responsibility of first degree murder.

After a lengthy trial that began August 27, 2001, and concluded September 5, 2001, the jury announced the following verdicts:

Count one - not guilty;
Count two - guilty of the lesser included offense of facilitation of second degree murder;
Count three - guilty of the lesser included offense of facilitation of second degree murder;
Counts four and five - not guilty;
Count six - guilty; and
Count seven - the defendant was not charged in this count.

The defendant was sentenced as a Range II, multiple offender on counts two and three to twenty years on each count. The defendant was sentenced as a Range II, multiple, violent offender on count six to 25 years at 100%. The sentences were consecutive with the result of an effective sentence of 65 years with 25 years at 100%.

The defendant raises six issues on this direct appeal:

1. The evidence was insufficient to support the convictions;
2. The trial court erred in allowing hearsay testimony under the conspiracy exception;
3. The trial court erred in allowing cross-examination of the defendant beyond the purpose of the hearing regarding the existence of a conspiracy;
4. The forensic pathologist was allowed to testify to matters beyond his area of expertise;
5. The trial court erred in its failure to instruct the jury regarding inadequate crime scene investigation; and
6. The trial court erred in applying the particularly vulnerable enhancement factor in sentencing.

**Facts**

The defendant, Johnny Lee Lewis, testified he was at the victim's residence from around midnight on July 29, 1999. His testimony at trial pegged his departure between 4:00 to 4:30 a.m. His claimed time of departure the morning of July 30 varied in his pre-trial statements from 4:00 to 5:15. The defendant said he had gone to visit the victim, at her request, to discuss information she intended to divulge to authorities concerning criminal activities of the Myers family, including drug dealing, stolen property, and alleged fraud involving Gary Myers' bankruptcy and social security application. The victim had expressed her intention to reveal this information on July 30, 1999.

The victim, Diane Watts, lived at the residence at 246 Myers Lane in McMinnville with her daughter, Jessica, and a co-defendant, Doug Myers. The other victim, Chelsie Smith, was an overnight guest of Jessica's. A business owner near the Watts' residence testified he reported the fire to 9-1-1 at 5:37. The log at the fire station noted a report of the fire at 5:45.

The responding firemen suppressed the remaining flames. The bodies of Diane Watts and her daughter were found in the rear bedroom. Chelsie Smith's body was in another bedroom. All three victims bodies were removed from the residence. A baseball bat and a torque wrench were found in the house and sent for lab analysis. Subsequent investigation and analysis of samples revealed that gasoline had been poured in a "Y" pattern from both bedrooms extending down the hallway, where it was ignited. A pocket knife, Old Timer brand, was found outside the residence. Diane Watts' purse was found inside, and it contained $1113.

Gary Myers, a co-defendant, testified that he had suffered a burglary at his home in June of 1999. Among the items taken was a lockbox, which was later recovered, in a damaged condition, by a third party. Law enforcement returned it to Gary Myers. The lockbox was given to Doug Myers in the company of Donnie Myers, another brother, and Raymond Hicks, son of Doug Myers. The defendant admitted in one of his statements that he and Doug Myers put the damaged box under the deck at Diane Watt's residence prior to July 29th. He further stated they took precautions to prevent their fingerprints from being placed on the box. The significance of these actions involving the lockbox are not entirely clear from the record, other than the implication that the victim was considered a suspect by Clementine Myers of being the burglary culprit. In this light, the clandestine placement might serve as a setup of the victim.

Vicky Fleming, sister of the victim Diane Watts, was at the victim's house on Wednesday preceding the murders. Ms. Fleming overheard Clementine Myers, a co-defendant and the mother of Doug, Donnie, & Gary Myers, in a phone conversation. Clementine stated that a "bunch" from Grundy County were coming to take care of those who burglarized Gary's home. According to Clementine, this only cost $5000, and she could get rid of anybody. She also stated that "they" knew the whereabouts of the victim Diane Watts, her daughter Jessica, and other family members at all times.

James Allen Holt testified that the defendant told him on the day before the fire and homicides that he had been watching a house that night. The defendant further stated, "There's a bitch we're going to burn out."

Jeff Mabe called the defendant on the morning of the fire. The defendant told Mabe he had been at the victim's residence about 4:30 or 5:00 a.m. A few days later, the two men discussed the deaths of the victims. The defendant stated that had he been there, he would have had to stop Doug before he hurt the children.

Shirley Humphrey was married to Doug Myers, but the defendant lived with her. Ms. Humphrey was told by the defendant, prior to the murders, that the victim Diane Watts was "stepping on toes" and making some people mad. During the week before the murders, she overheard the defendant talking with Doug Myers on the telephone. The defendant said that an unnamed "she" needed to be got rid of, but to make sure the little girl was not there. The defendant told Ms. Humphrey that Clementine Myers wanted something done to "shut the victim's mouth."

The week prior to July 30, the defendant had purchased several containers of gas. These containers were in his truck on July 29. After the homicides had occurred, the defendant told Ms. Humphrey that the victim was supposed to have been killed the night of July 28 or 29, due to the daughter being absent. The defendant stated that his job had been to go in and clean up the crime scene. He was also concerned over the loss of his knife either at the victim's residence or in a vehicle. On the Saturday following the day of the homicides, the defendant instructed Ms. Humphrey to burn some items of clothing, being a pair of pants, t-shirt, shirt, and pair of shoes. She followed his directions.

During the week following July 30, Ms. Humphrey drove the defendant to Winchester where he met Doug Myers at a department store. The defendant returned with $900 that he claimed came from Clementine Myers, but was $500 short.

Kevin Lawrence, the fire chief of McMinnville, was involved in seizing a vehicle from the defendant on August 2, 1999. The defendant inquired whether an Old Time pocketknife was in the vehicle.

David Campbell, a fire consultant, was called by the State as a witness. Mr. Campbell estimated that the fire in the crime scene burned from its inception, through its various stages, until it was extinguished for a total of one hour and fifteen minutes, plus or minus fifteen minutes.

Telephone records of the defendant's cell phone revealed calls to Clementine Myers' residence on the morning of July 30, 1999, at 5:45, 6:04, and 6:05.

Marilyn Myers, Gary's wife, testified that she and Gary were at the home of his mother, Clementine Myers, on either July 30 or the following day. The defendant was there, seated in the den. Clementine Myers was in the kitchen counting $100 bills and wearing "rubber gloves like

doctors wear." Clementine Myers stated "this will be the last damn money that the son of a bitch gets." Marilyn Myers had never known of the defendant to visit at Clementine Myers' home.

## Analysis

The defendant contends that the evidence was insufficient to support his convictions for facilitation of the second degree murders of Jessica Watts and Chelsie Smith and aggravated arson.

Although the defendant's appellate brief merely makes the assertion that the evidence preponderates against the verdict without a supporting argument, we feel obliged to review the challenge in accordance with established principles. Although the evidence of the defendant's guilt may be partly circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). However, in order for this to occur, the circumstantial evidence must be not only consistent with the guilt of the accused, but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypothesis except that of guilt. Tharpe, 726 S.W.2d at 900. In addition, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime." Id. (quoting Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)).

While following the above guidelines, this Court must remember that the jury decides the weight to be given to circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958); see also Gregory, 862 S.W.2d at 577; State v. Coury, 697 S.W.2d 373, 377 (Tenn. Crim. App. 1985); Pruitt, 460 S.W.2d at 391.

Tennessee Code Annotated section 39-11-403 provides in pertinent part as follows:

Criminal responsibility for facilitation of felony
    (a) A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.
    (b) The facilitation of the commission of a felony is an offense of the class next below the felony facilitated by the person so charged.

Second degree murder, Tenn. Code Ann. § 39-13-210 applicable part
    (a) Second degree murder is:
        (1) A knowing killing of another.

The applicable arson statutes are as follows:

Tenn. Code Ann. § 39-14-301 -
>Arson
>(a) A person commits an offense who knowingly damages any structure by means of a fire or explosion:
>>(1) Without the consent of all persons who have a possessory, proprietary or security interest therein; or
>>(2) With intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose.

Tenn. Code Ann. § 39-14-302 -
>Aggravated arson
>(a) A person commits aggravated arson who commits arson as defined in § 39-14-301 or § 39-14-303;
>>(1) When one (1) or more persons are present therein; or
>>(2) When any person, including firefighters and law enforcement officials, suffers serious bodily injury as a result of the fire or explosion.

As we must, we review the evidence in the light most favorable to the State and conclude that the evidence was clearly sufficient for a rational jury to find beyond a reasonable doubt that the defendant facilitated the second degree murders of Jessica Watts and Chelsie Milia Smith and committed aggravated arson of an occupied residence.

Statements by the defendant to James Allen Holt and Shirley Humphrey prior to the offenses indicated his involvement in preventing Diane Watts from carrying through her threat to divulge information of criminal activities. In the defendant's statement to Holt, the defendant professed to have been watching a house the night before the offenses and his intent to "burn a bitch out." The defendant made statements to Humphreys that the victim was causing trouble. Humphreys also overheard the defendant telling Doug Myers that "she" needed to be eliminated. The defendant stocked several containers of gasoline, the type of accelerant used in the arson. The defendant acknowledged in numerous statements that he was present at the victim's residence on the morning of the murders. The defendant placed three calls to the residence of Clementine Myers after leaving the victim's residence and then drove to Clementine's house. The defendant later claimed to have received $900 from Doug Myers that originated with Clementine Myers. The defendant was also seen within two days of the offenses at Clementine Myers' residence under circumstances from which a jury could infer she was paying him additional money.

After the events of July 30, the defendant directed Ms. Humphrey to burn some of his clothing and shoes that she described as perfectly usable. The defendant also indicated to Ms. Humphrey that it was his job to "clean up" the crime scene at the victim's residence.

The examining pathologist ascribed the ultimate cause of death for Jessica Watts and Chelsie Smith as smoke inhalation. The jury, having found the defendant guilty of aggravated arson, would have been fully justified in finding the defendant guilty of a greater degree of culpability than facilitation of second degree murder. The evidence, direct and circumstantial, point unerringly to the defendant and, we conclude, is sufficient to support the convictions.

In his second issue, the defendant complains that the trial court erred in admitting hearsay testimony pursuant to the co-conspirator exception of Tennessee Rules of Evidence 803 (1.2)(E).[2]

A jury-out hearing was conducted prior to trial to determine the existence of a conspiracy for purposes of proof at trial. The State presented three witnesses, and the defendant testified for the limited purpose of denying a conspiracy and his involvement. At the conclusion, the trial judge made this finding:

> My determination right now is to determine whether or not statements were made during the course of the conspiracy, promoting or facilitating a criminal act by a criminal or unlawful means, in which one or more people agree to engage in criminal conduct, and that the statements are made in furtherance of that conspiracy, and that Mr. Lewis was a party to the conspiracy. All of those would have to be answered in the affirmative.

> From the evidence the Court would find by a preponderance of the evidence and certainly not beyond a reasonable doubt, but by a preponderance of the evidence that a conspiracy existed to conceal stolen property, a conspiracy existed to cover up illegal conduct, and that Mr. Lewis was part of those conspiracies. I can't make a determination at this time as to whether or not Mr. Lewis was the conspirator in the theft of the victims, but I don't think that's necessary to get most of these statements in. So we will have that finding on the record.

A statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy is admissible even if hearsay. Tenn. R. Evid. 803 (1.2)(E). This exception originated in the law of agency wherein " . . . each conspirator is bound by the actions and statements made by other conspirators during the course of and in furtherance of a common purpose." See State v. Henry, 33 S.W.3d 797, 801 (Tenn. 2000). To establish admissibility, the prosecution must prove: 1) that there is evidence of the existence of a conspiracy and the connection of the declarant and defendant to that conspiracy; 2) the declaration was made during the pendency of the conspiracy; and 3) the declaration was made in the furtherance of the conspiracy. See Id. at 801, 802; Tennessee Law of Evidence § 803(1.2).6 at 521 -22 (Cohen, Sheppeard, Paine, 4th ed. 2000). Proof is established by a preponderance of the evidence. See Henry, 33 S.W.3d at 802; State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993).

---

[2] The defendant's brief refers to Rule 803(1.2)(D); however, the argument clearly pertains to subdivision (E).

We address this issue by summarizing the testimony of the witnesses at the jury-out conspiracy hearing. Jason Rowland, an investigator with the District Attorney's office, testified that he had interviewed the defendant on numerous occasions. The defendant had discussed a motive for the murder of Diane Watts. The defendant stated the victim had threatened to divulge certain criminal activity, including drug dealing. This information was to have been revealed to authorities on the day the victims' bodies were discovered.

Shirley Humphrey testified that the defendant lived with her at the time of the offenses. She related that the defendant had told her prior to the murders that the victim was "stepping on toes" and Clementine Myers, a co-defendant, wanted something done. In particular, the victim was threatening to cause problems for Gary Myers, a co-defendant, and his wife relating to their bankruptcy and a social security claim.

Ms. Humphreys stated the defendant told her his role in the offense was to "clean up," which she inferred to mean the arson. She had observed the defendant store gasoline in his truck prior to the murders. The defendant told her he may have lost a knife at the victim's house.

After the murders, the defendant told Ms. Humphrey the little girls were not supposed to have been present at the victim's home. On July 21, he requested Ms. Humphrey burn some of his clothing; jeans, a shirt, and shoes. Approximately a week after the murders, the defendant had her take him to Winchester and met co-defendant Doug Myers at a department store. The defendant returned from the meeting with $900 that he said came from co-defendant Clementine Myers.

Ms. Humphrey had owned a store that was run by Donna Eldridge. A tractor was taken from her store by Doug Myers and Doris Cantrell and disposed of in Grundy County. Later, a small Kubota tractor appeared which she learned was stolen. The defendant removed the tractor. She also discovered that the defendant had, with Donna Eldridge, conducted drug transactions at the store.

Vicky Fleming, the victim's sister, also testified. She said prior to the murders she was with the victim when a phone call was received from co-defendant Clementine Myers. She overheard Clementine Myers say that some group from Grundy County was coming to take care of whoever broke into co-defendant Gary Myers' home. The cost for this was $5000. Also during this conversation, the victim was told the group knew where she, her daughter, and other family members were at all times.

The defendant testified on his own behalf, and the trial judge issued findings as set forth previously.

The defendant's brief asserts that the court found a conspiracy existed to conceal stolen property. The defendant then disputes whether the lockbox was actually stolen property and sufficiency of the proof that the Kubota tractor was stolen. We need not address this argument. This is not the dispositive question. The trial court's findings were broader and more inclusive in finding a conspiracy to cover up other illegal activities.

To establish a conspiracy, the State may show an implied understanding between the parties and the conspiracy may be proven by circumstantial evidence or the conduct of the parties in the execution of the criminal act. No formal words or written agreement are required. State v. Alley, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997).

The testimony adduced was sufficient for the trial court to find, by a preponderance of the evidence, that the defendant was engaged with other co-defendants in a conspiracy to silence the victim, Diane Watts, and an attempt to conceal the crime scene by means of arson.

The defendant next contends that the trial court erred by allowing cross-examination of the defendant beyond the scope of the hearing. The defendant argues that the cross-examination violated Tennessee Rules of Evidence 104(d). The defendant voluntarily testified at the jury-out hearing to determine the existence of a conspiracy. The objection to the State's cross-examination came during questioning of the defendant concerning the time he left the victim's house the day of the offense. The exchange was as follows:

QUESTION: You told them it was daylight?

ANSWER: I think that might have been 15 until 5:00 maybe.

MR. WARNER [Attorney for the defendant]: Your Honor, he's testifying for the limited purpose to see if there is a conspiracy, not to shore up a time problem he has in his case in chief. Irregardless of what time he left would have nothing to do with the conspiracy. It's totally irrelevant for the purpose of this hearing.

MR. POTTER [District Attorney General]: Your Honor, this is cross and I think that what I'm building up to has nothing to do with the case in chief, but the steps he took after he left there and where he went and what he did, and that is part of this conspiracy.

The defendant contends the scope of the questioning violated his right to remain silent under the Fifth Amendment. The entire purpose of this limited preliminary hearing was to establish whether a conspiracy existed for purpose of later admissibility of evidence during the trial. The defendant voluntarily testified to rebut allegations of the conspiracy and thus subjected himself to cross-examination concerning factors that were relevant to or consistent with the existence of a conspiracy. Contrary to the defendant's assertion, his actions after leaving the victim's residence were not irrelevant as to whether a conspiracy existed. The commission of the offense that was the goal of the conspiracy does not necessarily end the conspiracy. State v. Henry, 33 S.W.3d 797, 803 (Tenn. 2000). His subsequent actions would be relevant toward possibly establishing a continuing conspiracy of concealment. Furthermore, the defendant's answers were neither enlightening to the State's case or inconsistent with the defendant's contentions. This issue is without merit.

The defendant next assigns error to the admission into evidence of the forensic pathologist's opinion that two or more people were involved in the offense. The specific testimony was:

QUESTION: Dr. Levy, again, based on the photographs that you've reviewed, the injuries to the victims that you've seen -- and I believe you indicated earlier that you had also observed two possible weapons -- did you form an opinion as to the number of perpetrators of the particular assaults we're dealing with here today?

ANSWER: I did.

QUESTION: Okay. And would you tell the Jury how many people you believe were involved and why you came to that conclusion?

ANSWER: Well, based upon my review of the photographs from the scene; where the bodies were located; the pattern of injuries to the three victims, specifically Chelsie Smith and her mother, [sic] Delores; how the blows were received in direction of blows, the location they were found; the fact that two separate weapons were used in this case, both baseball bat and this torque wrench, it's my opinion that there should have been or needed to be more than one person present. So there probably were two or more people involved in this incident.

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, provided the scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue. Tenn. R. Evid. 702. An expert may base his or her opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing; the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts. Tenn. R. Evid. 703. If the underlying facts or data lack trustworthiness, the court shall disallow expert testimony based upon them. Id. Evidence and expert testimony regarding scientific theory must be both relevant and reliable before it may be admitted. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997).

The trial court has broad discretion in resolving questions concerning the qualifications, admissibility, relevance, and competency of expert testimony. State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). An appellate court should not overturn a trial court's decision in admitting or excluding a proposed expert's testimony unless it finds the trial court abused its discretion. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

The same issue was addressed in State v. West, 767 S.W.2d 387, 401-02 (Tenn. 1989). Under a similar factual scenario, the Court characterized the forensic pathologist's opinion as arguably within his realm of expertise. The West Court observed that even if technically outside the forensic pathologist's expertise, the error was harmless when he was subject to cross examination and the jury was correctly instructed on expert testimony. This is dispositive of the issue at hand.

Therefore, we find no abuse of discretion on behalf of the trial court in allowing this testimony. Parenthetically, we note that it ill serves the defendant to object to testimony that buttressed his own theory of two assailants. This theory was urged upon the jury on two separate occasions during the defendant's opening argument.

The defendant next assigns as error the failure of the trial court to instruct the jury regarding an inadequate crime scene investigation, which could infer that the missing evidence was favorable to the defendant. Specifically, the defendant contends that removal of the bodies from the house prior to arrival of law enforcement tainted the crime scene.

We agree with the defendant that the appropriate standard of review is provided by State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999). We are also mindful that it is difficult to define the boundaries of the State's duty to preserve evidence. Id. at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2533-34, 81 L. Ed. 413 (1984)). The evidence must be of sufficient value to play a significant role in the accused's defense, and its exculpatory value must have been apparent before the evidence is destroyed. In addition, the destroyed evidence must be of a nature that the defendant could not obtain comparable evidence by other reasonably available means. Ferguson at 917. Only after this initial inquiry demonstrates the existence of a duty by the State and failure in that duty does the Ferguson analysis apply.

The removal of the bodies was pursuant to a policy then in effect in the McMinnville Fire Department. That alone would not excuse a duty to preserve evidence. However, under these facts we do not agree that the removal of the bodies served to destroy evidence. There was abundant testimony from the firemen performing the removal as to the bodies' respective original locations and their positions. Their removal did not prevent a subsequent autopsy and the detailed findings by the forensic pathologist. The defendant fails to suggest any specific defense that was lost by him due to the bodies removal. Likewise, we do not consider the removal as "destruction" of exculpatory evidence or as an impediment to the accused's defense. This issue is without merit.

The defendant's last issue alleges error in the trial court's application of the sentencing factor that the victims were especially vulnerable. A defendant who challenges his or her sentence has the burden of proving the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). It is this Court's duty to conduct a *de novo* review of the record with a presumption the trial court's determinations are correct when a defendant appeals the length, range, or manner of service of his or her sentence. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999).

The weight given to each enhancement or mitigating factor is in the discretion of the trial court, assuming the trial court has complied with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Madden, 99 S.W.3d 127, 138 (Tenn. Crim. App. 2002). The statutes prescribe no particular weight for an enhancement or mitigating factor.

State v. Gosnell, 62 S.W.3d 740, 750 (Tenn. Crim. App. 2001). A defendant's sentence "is not determined by the mathematical process of adding the sum total of enhancing factors present then subtracting from this figure the mitigating factors present for a net number of years." State v. Alder, 71 S.W.3d 299, 306 (Tenn. Crim. App. 2001) (quoting State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996)).

A sentence may be enhanced if a victim of the offense was particularly vulnerable because of age or physical or mental disability. Tenn. Code Ann. § 40-35-114(4). The vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age. The factor can be used if the circumstances show that the victim, because of his age or physical or mental condition was in fact particularly vulnerable, i.e., incapable of resisting, summoning help, or testifying against the perpetrator. The determination of whether the factor applied is a factual issue is to be resolved by the trier of fact on a case by case basis. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

Proof of age, standing alone, may be insufficient to establish particular vulnerability. State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995). A victim is particularly vulnerable within the meaning of this enhancement factor when the victim lacks the ability to resist the commission of the crime due to age, a physical condition, or a mental condition. State v. Boggs, 932 S.W.2d 467, 473 (Tenn. Crim. App. 1966).

In the case at hand, the trial judge applied the vulnerability enhancement to the sentences for facilitation of second degree murder of Chelsea Smith, age 13, and Jessica Watts, age 10, as well as the aggravated arson conviction. Medical proof showed that both minors had suffered serious head injuries from blunt trauma, but died of smoke inhalation. The forensic pathologist opined that the girls might have survived the beatings with medical attention, but died from the results of the fire.

The trial judge articulated his use of vulnerability as an enhancement as follows:

The next enhancing factor the State urges is that the victim was particularly vulnerable because of age. This enhancement factor also indicates particular vulnerability because of physical disabilities. I think this one can be applied. If not because of age, then because of the vulnerability because of their being in a beaten condition at the time the fire was started.

There was evidence in this case that the beatings rendered these minors particularly vulnerable to the ultimate cause of their demise, smoke inhalation. Dr. Levy, the forensic pathologist, testified that his autopsy revealed Chelsie Smith received a minimum of five blows to the head and one in the groin area. Jessica Watts was the recipient of a minimum of three blows to the head. Both of these victims had developed swelling of the brain. Dr. Levy explained that this indicates their survival for at least twenty minutes until they both succumbed to smoke inhalation. Dr. Levy elaborated that twenty minutes is the minimum elapsation for brain swelling to become visible and that after death, swelling would not occur. This would indicate that these two victims

were either unconscious or incapacitated due to the beatings and rendered particularly vulnerable to the arsonous attack that followed.

We conclude the evidence was sufficient to justify the application of the particularly vulnerable enhancement factor in this case. The trial court was aware of the age and size of the two minors and their susceptibility to attack from an adult armed with a torque wrench and/or baseball bat. With equal insight, the trial judge appropriately observed that these two victims, in their beaten condition, were particularly vulnerable in their inability to resist, summon help, or escape the fire that was the ultimate cause of their demise.

Accordingly, we affirm the convictions and sentence of the defendant in all respects.

_____
JOHN EVERETT WILLIAMS, JUDGE