# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 18, 2011

## STATE OF TENNESSEE v. FRANCISCO JAVIER ANCONA

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-977    Mark J. Fishburn, Judge**

_____

**No. M2010-02095-CCA-R3-CD - Filed August 13, 2012**

_____

The Defendant, Francisco Javier Ancona, was convicted by a Davidson County Criminal Court jury of first degree felony murder, attempt to commit especially aggravated robbery, a Class B felony, aggravated burglary, a Class C felony, aggravated assault, a Class C felony, and employing a handgun during the commission of a dangerous felony, a Class C felony. See T.C.A. §§ 39-13-202, 39-13-403, 39-14-403, 39-13-102, 39-17-1324(b) (2010). He was sentenced to life imprisonment for the first degree felony murder conviction, fifteen years for the attempted especially aggravated robbery conviction to be served concurrently with the first degree murder conviction, nine years for the aggravated burglary conviction to be served consecutively to the first degree murder conviction but concurrently with the aggravated assault conviction, nine years for the aggravated assault conviction to be served consecutively to the first degree murder conviction but concurrently with the aggravated burglary conviction, and nine years for employing a handgun during the commission of a dangerous felony conviction to be served consecutively to the aggravated burglary conviction, resulting in an effective sentence of life imprisonment plus eighteen years. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction for attempted especially aggravated robbery; (2) the trial court erred by admitting hearsay statements of the Defendant's co-defendants into evidence at the trial; (3) the trial court erred by failing to redact a statement made by a co-defendant to the police from a telephone recording played at the trial; (4) the trial court erred by allowing the State to amend the indictment to include a greater offense than originally charged; (5) the trial court erred by allowing separate convictions for attempted especially aggravated robbery and aggravated burglary; and (6) the trial court erred by imposing partial consecutive sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal) and J. Michael Engle (at trial), Assistant District Public Defenders, Nashville, Tennessee, for the appellant, Francisco Javier Ancona.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Robert Elliot McGuire and Janice Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the home invasion of the residence of George and John Young that resulted in the death of John Young. At the trial, Nashville Metropolitan Police Officer Johnny Lawrence testified that on November 23, 2008, he investigated the scene of the crimes at a home on Wesley Avenue. He said he collected three shell casings and described a photograph of the hallway inside the home showing a "strike mark" on the hallway wall that came from the bedroom. He said the marks were bullet strikes. The home had two bedrooms, and the shooting took place in the bedroom in which the window was broken and the shell casings were found. He found a large amount of cash inside the bedroom closet.

Officer Lawrence testified that John Young had been found deceased in the second bedroom and had been taken to the hospital before he arrived. A large amount of blood was on the bed where the victim was found. He said that a loaded revolver was found in the bedroom and that photographs taken by another officer showed four live rounds and one shell casing in the revolver.

Officer Lawrence testified that the hallway went to the right and led to the bathroom and the back door. A window in the bathroom overlooked the backyard. The back door was near the bathroom window and was damaged, including a crack along the length of the door and a bent lock. He did not know if the crack was there before the home invasion. Black powder and footprints covered the outside of the back door. He said the door was removed, collected as evidence, and transported to the police department's property room. He said that three other officers collected evidence at the scene and that his responsibility was to take photographs and review all the evidence collection work at the scene.

On cross-examination, Officer Lawrence testified that he could not recall the date on which he impounded the back door, but he thought his sergeant wanted the door collected

before he left the scene. He said that he was at the scene twice and that he collected the window frame of the broken window, broken glass, and a piece of curtain from the window. He said the date and time when the door was collected was listed on the door.

Officer Lawrence testified that fingerprints were taken by Ms. Mahaney, formerly Ms. Primm, and that the fingerprints were taken before he took the photographs of the scene. He agreed he assisted Officer Linville in making plaster casts of the shoe impressions in the backyard. He said the shoe impressions were consistent with and almost identical to the impressions on the back door. He believed it was possible that the footprints in the backyard and on the back door were made by the same foot.

On redirect examination, Officer Lawrence testified that he took the back door from the property room to the courthouse at the request of the State. He had not removed the door from the property room before bringing it to court for the trial, but he did not know if anyone else had removed it. He said the door had more evidentiary value than the footprint casts because the door was the entry point into the home. He said the footprints could have been from anyone.

On recross-examination, Officer Lawrence testified that he collected the back door on December 11, 2008, and that he took it to the property room. He agreed that the crime was reported on November 23, that he collected the broken window on November 28, and that on December 11, he collected the door from the laboratory at the police station and took it to the property room. He did not return to the scene on December 11.

George Young, Jr., testified that he lived at the home in question with his brother, John Young, in November 2008. He said John was sixty-three years old at the time of his death, heavy-set, and had many health problems, including a heart condition, emphysema, sleep apnea, and diabetes. He said that a telephone sat on a small table at the end of the hallway, that the room to the right was his bedroom, and that his brother's bedroom was across the hall next to the kitchen.

Mr. Young testified that on November 22, 2008, at approximately 10:00 p.m., he and his brother were watching a football game on television in his bedroom. He said that after the game ended around 10:30 p.m., he and his brother went to bed. He heard a knock at the back door as soon as he got into bed. He got up, went to the door, and told his brother they had company. He said his brother got out of bed, went to the bathroom, and raised the window. He said he stood to his brother's side and saw two people on the back porch, one who faced the house and another who faced away from the house. He said the person who faced away from the house was taller than the person who faced the house. He said both wore coats, had hoods pulled over their heads, and had their faces covered. He only saw

-3-

their faces from the eyes to the chin. He heard his brother talking to them from the bathroom widow, but he could not understand what was said. He said that his brother told them to leave and that they left.

Mr. Young testified that he asked his brother what the two people wanted and that his brother stated that Duane sent them to borrow money. His brother did not know anyone named Duane, but he knew a man named Duane Vaughn. His brother went back to bed. He said he walked to the front door and looked out the window to ensure they left. He saw them walk away from the house. He said that his brother loaned friends money periodically and that it was not unusual for people to come to the house looking for a loan. He did not know the amounts of his brother's loans.

Mr. Young testified that he went to sleep and that the next thing he remembered was hearing a knock at the door. He said someone came into his bedroom, stood at the end of his bed, and pointed a gun at him. He could not see the person holding the gun, only a shadow. The person said, "Get up, MF," and he complied. The same person asked "where the boss man" was. He said that he did not know what to say, that he took a couple of steps, that the person struck him on the back of the head with a pistol, and that he fell to the floor. He heard gunfire and someone say, "Put the gun down, I'll shoot the MF." He said that he was dazed from being hit in the head but that he heard the sound of breaking glass. He thought the broken glass was caused by someone jumping out the window. He called 9-1-1, went to his brother's room, pushed the door open, and called out for his brother two or three times but received no response. The State and the Defendant stipulated that Nashville Emergency Communications received a 9-1-1 call from the scene on November 23, 2008, at 1:30:24 a.m.

Mr. Young testified that to his knowledge, the police did not remove anything from his home the night of the shooting. He identified two photographs of his bedroom closet and a photograph of his money inside the closet. He said that he had saved the money over ten years and that the money was for his retirement. He kept $30,000 in the closet and said he did not "do much banking business." He recalled the police took the back door about one week after the shooting. He said that he had neither heard of nor seen the Defendant before November 2008.

On cross-examination, Mr. Young testified that there was a vanity below and slightly to the left of the bathroom window and that there was a toilet below the bathroom window. He could not recall if his brother turned on the back porch light, but he did not turn on the light. He said the back porch light was usually off.

-4-

Mr. Young testified that he could not determine if the person who faced away from the house was male or female. He disagreed that he told the police that the person who faced the home was a male and in his twenties. He only remembered telling the police about the visible portion of the face. He did not recall telling the police that the person who faced the home was a white male, but he recalled telling the police that the man was 5'5" to 5'7" tall. He agreed he told the police that the man had a thin beard on his chin and a mustache. He did not know if he saw the man before or after the shooting because he only saw a portion of the man's face. He agreed that the police showed him a photograph lineup and that he identified the man he thought stood on the porch the night of the shooting. He agreed that he wrote on the lineup that he was 100% sure he had identified the man who stood on the porch and spoke with his brother the night of the shooting. The record indicates that the person Mr. Young identified was not the Defendant.

Mr. Young testified that he did not recall stating that the person who came in his bedroom was 5'7" tall and 180 pounds but that it sounded correct. He said it was dark in his bedroom and difficult to see. He agreed that he could not determine the age or race of the person who entered his bedroom and that he told the police he thought the man was black based on the person's speech. Although he did not recognize the person's voice, he disagreed that the statement, "Put the gun down, I'll shoot the MF," came from his brother. He said that to his knowledge, his brother did not say anything during the home invasion.

Mr. Young testified that he and his brother owned guns but that to his knowledge, his brother's guns were never loaded. He said his brother had a .32 caliber pistol, another small pistol, and bullets in a drawer, but the guns were never loaded. He agreed that photographs showed a loaded revolver found in his brother's bedroom. He identified a photograph showing his gun and said the gun had not been fired before the home invasion. He agreed a second photograph of the same gun showed four bullets and one spent cartridge. He said his gun was kept in his brother's drawer and agreed his brother could have loaded the gun. He did not know who fired the gun because he was face down on the floor in his bedroom. He said that his brother was lying on the side of the bed after the home invasion but that he did not see a gun because it was dark.

Mr. Young testified that he did not trust banks and that keeping $30,000 in his home created risk. He said only his brother knew about the money. He said that although it was not unusual for people to come to his house looking for a loan, it was unusual for anyone to come at night. He said that his brother's lending money to people occurred frequently and that his brother kept records of the debtor's names and debts. He did not know if his brother charged interest on the loans. He stated that his brother usually kept $200 or $300 in the home and that only his brother's friends knew his brother loaned money.

Richard Allen testified that he was convicted of felony failure to appear in 2006, aggravated burglary and theft of property in 2005, and burglary of a motor vehicle and identity theft in 2003, and that he was currently released on community corrections. He said he was arrested in December 2008 for violating the terms of his probation and remained in custody until June 2009. He said he first met the Defendant on November 22, 2008, when he lived with his brother off Dinwiddy Road and used his sister-in-law's cell phone. He said he received a telephone call on November 22, 2008, from Steven "Woody" Johnson, whom he had known his entire life. He said Mr. Johnson asked him if he "want[ed] to hit a lick," which he said meant to do something to make money. He said they did not discuss it further over the telephone.

Mr. Allen testified that Steven Johnson, Ricky Johnson, Steven's brother, and the Defendant came to his home on November 22, 2008, and that the men discussed "the plan" while sitting in Steven Johnson's SUV. He said the Defendant told him that his job was "to stand there holding a gun, don't let nobody get to him." He stated that at that time, he did not know where this was going to take place but that he was told two old men lived in a house with a box of cash. He said he assumed all four men were going to get the money and believed the men were going to take the money by force. He said that Steven Johnson asked him to participate but that the Defendant, who was fidgety, did most of the talking.

Mr. Allen testified that the conversation in the driveway lasted fifteen minutes and that he told the three men to call him in one hour. He said the men left, and he went to Dark Horse tattoo parlor, one and one-half blocks away from his home. He was familiar with the Ink Gallery Tattoo parlor, which was not close to his home. He said he did not speak to the three men again that night, but he left instructions for his sister-in-law to tell Steven Johnson that he said, "No," when Mr. Johnson called.

Mr. Allen testified that after November 22, 2008, he was arrested for violating his probation. He was jailed with Josh Young, who was John Young's son. He told Josh Young everything he knew about the robbery and murder. He said that after he spoke with Josh Young, Detective Curtis Hafley came to speak with him while he was in custody. He said he never contacted anyone about Mr. Young's murder. He admitted that he attempted to negotiate his release from custody with Detective Hafley but that he was not released. He said that he told Detective Hafley what he knew about the murder before being contacted by the District Attorney's Office. He agreed he remained in custody until spring 2009 and received nothing in exchange for his testimony.

On cross-examination, Mr. Allen testified that his role in the robbery was to hold the gun while the Defendant took the money. He said that he was not shown a photograph lineup and that his courtroom identification of the Defendant was based on his memory of

-6-

November 22, 2008. He said that although it was late at night when he first saw the Defendant, he was "wide awake." He denied agreeing to participate in the robbery while the plan was discussed. He said his asking the men to contact him one hour later was his way of saying that he did not want to participate.

Mr. Allen testified that after he was released from custody, he spoke to Steven Johnson and discussed his testimony while attending the Johnson family picnic. He agreed that he was interviewed by Detective Hafley and that he gave the detective additional information he learned from "people on the streets." He said the men inside the SUV did not argue and denied that the discussion was moved to another location. He said the SUV never left his driveway.

Mr. Allen testified that the Defendant was "geeked up" on drugs and seemed irrational. He agreed he told Detective Hafley that the Defendant was "too weird, something was wrong with him." He agreed that he did not think the men were going through with the plan. The Defendant told him that the Defendant would get the money from the shoe box that was underneath the bed. He was told the shoe box contained $60,000. He agreed that someone said, "Don't shoot anybody." On redirect examination, Mr. Allen stated that his testimony was consistent with his prior testimony at Steven Johnson's trial.

Elizabeth Gail Barber testified that on November 22, 2008, she and her three-year-old son went to Wendy Johnson's home for dinner. She said that Ms. Johnson was Steven Johnson's former wife and that the Johnson brothers were childhood friends. She said that after dinner, she and Ms. Johnson drove separately to meet Steven and Ricky Johnson and the Defendant in the Walmart parking lot. She said the men arrived in Steven Johnson's SUV. She said they were "hanging out and talking" when Steven Johnson asked her if she wanted to make some money. She wanted to make money, and although she was not given the details, Steven Johnson told her about a robbery and drugs in a house. She agreed to let the three men use her truck during the robbery.

Ms. Barber testified that she, her son, Wendy, Steven, and Ricky Johnson, and the Defendant went to Ink Gallery tattoo parlor where Ms. Johnson got a tattoo. She said that she, her son, and Ms. Johnson took Ms. Johnson's truck to Ms. Johnson's parents' home after they left the tattoo parlor. She then drove her son and Ms. Johnson in her truck to a side street on Trinity Lane. She said Steven and Ricky Johnson and the Defendant met them at the same location in Steven Johnson's SUV. She, her son, and Ms. Johnson got into Steven Johnson's SUV, and Ricky Johnson and the Defendant got into Ms. Barber's truck. She saw a gun in the console of Steven Johnson's SUV.

Ms. Barber testified that she and her son and Steven and Wendy Johnson waited at a White Castle restaurant while Ricky Johnson and the Defendant drove to the victims' home. She recalled that Steven Johnson was on his cell phone with Ricky Johnson when Steven Johnson asked, "Was that gunshots?" She said the Defendant agreed to go into the home during the robbery while they were in the Walmart parking lot. She saw her truck drive by White Castle, and they got into Steven Johnson's SUV and followed.

Ms. Barber testified that her truck and the SUV were traveling to Steven Johnson's parents' home when both vehicles pulled over and the Defendant got into the SUV. She said the Defendant did not speak during the drive. After they arrived at the home, she and her son got into her truck. She said that Ricky Johnson told her that he was going to hide the gun and that she saw him hide the gun. She did not recall the Defendant's talking about the home invasion. She said she found out the next day at Ms. Johnson's house what occurred.

Ms. Barber testified that she failed to tell Detective Hafley during their first meeting that her son was with her the night of the robbery and that Ricky Johnson was present at the Walmart parking lot. She said that she did not tell the police about her son's presence because she was afraid he would be removed from her care but that her failure to mention Ricky Johnson's presence was unintentional. Although she was not forthcoming with Detective Hafley about her involvement in the robbery, she told the detective about her role without his making promises to her. She was convicted of writing worthless checks in 2003 and shoplifting in 2009.

On cross-examination, Ms. Barber testified that she knew the police found her by her cell phone records. She clarified that Ricky Johnson told her he was going to hide the gun and that she saw Ricky Johnson walk away from the Johnson family home. She told Detective Hafley about Ricky's hiding the gun, but she could not recall if she told the detective during their first or second meeting.

Ms. Barber testified that although she did not know the difference between a revolver and a semiautomatic handgun, she knew that she saw a gun the night of the robbery in the console of Steven Johnson's SUV. She saw Steven Johnson handling a gun with a cylinder and agreed he told her that her share of the robbery was $1000 for the use of her truck. She never received the money.

Ms. Barber testified that she met the Defendant twice before the robbery and that she saw a picture of the Defendant during her testimony at Steven Johnson's trial. She said she had not consulted an attorney about her involvement in the robbery and did not know if she would be charged with murder. She denied being told that she would not be prosecuted for murder if she testified against the Defendant and his co-defendants. She agreed she was part

of the plan to commit robbery and assisted in the robbery by allowing her truck to be used.

Alicia Johnson testified that she was Steven Johnson's wife and that in November 2008, she lived with her husband, their two children, her in-laws, Steven Johnson's two children from a previous marriage, and Ricky Johnson. She said that her husband befriended the Defendant and that the Defendant stayed at the home periodically from fall 2008 through November 2008 and slept in her father-in-law's garbage truck. She stated that on November 22, 2008, she went to a church dinner with Steven and Ricky Johnson and the Defendant. She said that she overheard her husband and the Defendant talking about "hitting a lick." She said that after she heard the topic, she walked away. She said that after dinner, everyone returned home, but she could not recall if the Defendant was there. She said that she got into an argument with Steven Johnson, that Mr. Johnson left the home, and that he did not return until the next morning. She remembered seeing the Defendant the next morning too.

Ms. Johnson testified that in the early morning hours of November 23, 2008, she awoke to a slamming door. She saw Steven and Ricky Johnson carrying the Defendant into the home. She stated that the Defendant had a cut on his leg and that she gave the Defendant Band-Aids. She said Ms. Barber and Wendy Johnson arrived at the home soon after the men arrived. She said Steven Johnson told her what happened after they saw the morning news report about the robbery and shooting. She said Mr. Johnson stated, "That's it," when he saw the news report on the television. She did not tell the police that she gave the Defendant Band-Aids because she feared being charged with a crime, although she did not know how the Defendant received his injuries at the time.

On cross-examination, Ms. Johnson denied making false statements to the police and said that she only omitted information. She did not recall telling the police that she did not see a cut on the Defendant or that she did not see the Defendant apply bandages to himself. She said Wendy Johnson was present at the church dinner. She said Wendy Johnson was her husband's former wife who had two children with him and was her friend. She said she also knew Ms. Barber but could not recall if Ms. Barber attended the church dinner.

Norman Smith testified that he knew the Defendant as a "street friend" through using drugs and that he probably met the Defendant in 2006. He saw the Defendant on November 23, 2008, crossing the street and getting into his truck. He said that this was not unusual and that a female known only as Little Bit was also in Mr. Smith's truck. He said the Defendant looked normal but acted nervous and talked about someone who died. He said that the Defendant suggested they buy drugs but that the Defendant did not buy any drugs. He said that while they were driving around, the Defendant told him that "he had shot somebody and that the guy was dead." The Defendant said he was going to leave town.

Mr. Smith testified that the Defendant told him that he shot the victim, jumped out the window, and cut his leg. The Defendant stated that his leg was bleeding and that he knew he was going to jail because he left his DNA at the scene. He dropped the Defendant off at a convenience store and drove away. He was stopped by the police thirty minutes later because of a broken taillight. He said that the police officer addressed the broken taillight and that the officer released him without charging him with an offense. He said that before he drove away, he asked the officer if there had been a recent shooting. The officer used his radio to confirm that a shooting had occurred, and the police sent a detective to speak with Mr. Smith. He told the detective about his conversation with the Defendant. He said that he was having financial difficulties at the time and that he wanted any available reward. He never received any money for the information he gave the detective. He agreed he was convicted of theft on September 26, 2006.

On cross-examination, Mr. Smith testified that he did not recall when he saw the Defendant on November 23, 2008, but recalled that it was dark outside. He denied being under the influence of drugs when the Defendant told him about the shooting but admitted he was looking for drugs at the time. He knew his conversation with the police was recorded and admitted listening to the recording before his testimony. He told the police that the Defendant said he was startled by the victim. He did not know if the Defendant's shooting the victim was the result of the victim's shooting first. He agreed he told the police that he picked up the Defendant on November 23 because it was cold outside. He agreed he did not tell the detectives that he and the Defendant were looking for drugs when the Defendant mentioned the shooting.

Mr. Smith testified that he learned there were people who claimed he was present during the shooting. He denied being involved in the shooting and said he was with "Little Bit" in a hotel room during the shooting. He said the hotel was on Trinity Lane but could not remember the name. He could not recall if the hotel room was registered in Little Bit's or his name but recalled the room was not registered under a false name. On redirect examination, Mr. Smith testified that when he saw the Defendant on November 23, the Defendant was wearing a Sponge Bob Square Pants jacket but that he could not recall if he had seen the Defendant wearing the jacket before that day.

Detective Paul Harris testified that he investigated the robbery and murder of John Young and that on November 23, 2008, he interviewed Mr. Smith. He said Mr. Smith gave a physical description of the Defendant, an injury to the Defendant's leg, and the Defendant's clothes. Mr. Smith also told him where to find the Defendant. He said that based on Mr. Smith's information, he went to the Express Market and saw the Defendant wearing a Sponge Bob Square Pants jacket. He approached the Defendant, who said he was waiting for Steven Johnson.

Detective Harris testified that he took the Defendant into custody and that he collected and photographed his clothing and shoes. He identified four photographs of the shoes the Defendant wore at the time of his arrest. He said the shoes were of interest because of the footprints left in the sand and on the door of the victims' home. He said the Defendant's cell phone was collected. He said he photographed an injury to the Defendant's leg. Two photographs showed three parallel, vertical scratches on the Defendant's leg.

Detective Harris testified that the Defendant stated that he was living at 1221 London Bridge Road at the time of his arrest and that he obtained a search warrant for that address. He said Steven Johnson, Ricky Johnson, Steven Johnson's parents, and some of Steven Johnson's children also lived at the home. He said he spoke to Steven Johnson during the search of the property about the Sponge Bob Square Pants jacket.

Metropolitan Police Officer Charles Linville identified the diagram he drew of the victims' home with measurements and the location of evidence recovered by the police. He said a shell casing was found inside the bedroom across from the kitchen and adjacent to the living room. He said shell casings were ejected from semiautomatic guns, not revolvers. He said a person had to manually remove the shell casings from a revolver's cylinder. He said the victim's gun was found in the bedroom adjacent to the bathroom. Projectile fragments and strikes on the wall were found in the same bedroom. He said a projectile fragment was a portion of a bullet that fractured into pieces after striking an object. He found blood on the bed and the floor near the doorway. He said all the shell casings were found in the same bedroom.

Officer Linville testified that the marks found on the interior wall were caused by bullets striking the wall. He said the marks showed that shots were fired inside the home and the bullet trajectory. He said that the majority of the bullets came from the same direction but that one bullet came from the opposite direction. He made a diagram that showed where the marks were found inside the home, which was received as an exhibit. He found four marks on the wall inside John Young's bedroom. He said all four marks showed that the bullets were headed toward the east wall of the home. He found marks "that passed through the west wall toward the east wall" in George Young's bedroom. He said that the gun was fired from George Young's bedroom and that the bullet traveled toward the east wall. A second mark found in George Young's bedroom came from the east wall toward the west wall. He said Officer Primm took photographs of the marks. He identified photographs of the marks found inside the home and photographs of evidence marked with police evidence markers at the scene.

Officer Linville testified that he created a diagram of the outside of the victims' home. He collected three shell casings found outside the home. He identified photographs of the broken window that showed three strike marks to the ceiling in the bedroom. He said all three bullet casings were .40 caliber bullets. He dusted for fingerprints at the victims' home but none "matched."

On cross-examination Officer Linville testified that he did not know how many fingerprints were lifted from the scene. He said there were several potentially usable fingerprints found at the scene. The fingerprints were delivered to the police department's latent fingerprint division. He agreed he found a pattern of footprints outside the home. He made two plaster casts of the footprints.

Former Nashville Metropolitan Police Officer Alicia Primm Mahaney testified that she was a crime scene investigator from February 2006 to January 2009 and that she documented and processed the scene. She photographed the scene and George Young's injuries and processed the back door for latent fingerprints. She said that the back door had shoe prints around the lock and doorknob. She identified three photographs of the back door, which were received as a collective exhibit. She stated that she did not collect the back door for evidence but that she lifted the shoe prints from the door while at the scene on November 23, 2008.

On cross-examination, Ms. Mahaney testified that she found latent fingerprints on the back door but that she could not recall the location of the fingerprints on the door or the number of fingerprints obtained. She did not receive a fingerprint analysis report. She agreed the door had a receipt signed by Officer Johnny Lawrence that showed the door was checked into the police department property room on December 10, 2008. She did not know who collected the door or when it was collected.

Tennessee Bureau of Investigation (TBI) Agent Linda Littlejohn, an expert in fingerprint analysis, testified that she analyzed a pair of shoes from 936 East Trinity Lane and fingerprints obtained from the exterior of a back door. A copy of her official report was received as an exhibit. She said that the shoes had similar tread design as the shoe prints taken from the door and concluded that the right shoe could have made the shoe prints because they were consistent in size, shape, and tread design. She said, though, the shoe prints could have been made by any Air Jordan shoe in the same size, shape, and tread design. She did not find individual characteristics on the shoes to exclude all other shoes.

On cross-examination, Agent Littlejohn testified that she did not receive plaster casts of the footprints or the back door and that it was possible that the casts of the footprints would have helped her analysis. She said the door would not have helped her analysis

because she could not perform any type of enhancement on the door. She said the Defendant's shoes were placed into a plastic evidence bag, and as a result, the shoes developed mold. She did not know if DNA evidence was recoverable because of the mold. Her notes did not reflect that she saw reddish brown stains on the shoes. She did not know the number of Air Jordan shoes sold by the Nike Corporation nationwide or in Middle Tennessee. On redirect examination, Agent Littlejohn testified that she would have processed the plaster casts had the State or the Defendant requested an analysis.

Assistant Special TBI Agent Richard Littlehale testified that he was responsible for analyzing communication records from mobile devices, service providers, and e-mail communications. He said that he analyzed cellular telephone communications from Cricket Communications (Cricket) obtained by Detective Hafley, that he obtained the locations of Cricket's cellular towers, and that he utilized maps from Metro Mapping to determine the distance between different areas. He said that Cricket provided him a summary of information about their network and that the summary stated the maximum design range of Cricket's towers was ten to twelve miles in rural locations with flat land, and in urban areas with dense populations and structures, the design range was "significantly reduced" and could be less than one mile. The summary also stated that "[t]he actual range rather than the design range can vary from moment to moment because of call volume, weather, obstructions, foliage," and other factors. He said these factors impacted which tower received a telephone call. The Cricket summary stated that there was no method to determine the location of a telephone at the time a call was made. He said Cricket's records only showed which tower a telephone used at a particular time, which was not always the closest tower. He said the closest tower to the scene was Tower BNA 077A and was 0.74 miles from the victims' home.

On cross-examination, Agent Littlehale testified that his work was solely based on data provided by Cricket and did not include different service providers, including Verizon Wireless (Verizon). He agreed Verizon telephones did not use Cricket towers. He said Cricket provided the coordinates of the locations of the towers used during a telephone call, not coordinates of the location of the telephone that made the call.

Nashville Metropolitan Police Detective Curtis Hafley testified that he was the lead investigator in the home invasion. He said the evidence inside the home showed that the person who went into the victims' home left through George Young's bedroom window. He thought the person might have been injured by the broken glass. He said that he received a telephone call on November 23, 2008, from another detective, who had information about the murder. The Defendant was arrested the same day.

-13-

Detective Hafley testified that the Defendant's cell phone was collected at the time of his arrest, that he obtained a search warrant for the telephone, and that the police department's technical services division analyzed the telephone's contents. He said the telephone belonged to the Defendant based on the contact information the Defendant gave at the police station. He obtained a court order requiring Cricket to provide him the records showing outgoing and incoming telephone calls and text messages and the cellular tower information from the Defendant's telephone. He received telephone records from the Defendant's and Steven Johnson's telephones, which were received as an exhibit. He said he cross-referenced the telephone records between the Defendant and Steven Johnson. He also obtained Mr. Allen's cell phone records. He said that based on his conversations with Mr. Allen, the Defendant, and other co-defendants and the cell phone records, he was able to corroborate the information he received during his investigation.

Detective Hafley testified that cellular Tower BNA 095A was several hundred feet from Steven Johnson's home. He noted the Defendant stayed at Mr. Johnson's home periodically. He said that on the night of the murder, Mr. Johnson's and the Defendant's telephones used Tower BNA 095A at 9:18 p.m. He said neither telephone used Tower BNA 095A again until 1:46 a.m. He stated that cellular Tower BNA 077A was 0.74 miles from the victims' home and that although the Defendant did not place a telephone call, his cell phone communicated with that tower at 10:23 p.m. He said the timing of the communication with Tower BNA 077A was important because George Young told the police that two men knocked on the back door around the same time.

Detective Hafley testified that he took photographs of the Defendant's cell phone screen when the Defendant was arrested and that the phone showed telephone numbers for Steven Johnson and Leann Totty, the Defendant's mother. He took a photograph of the call log that showed an incoming call from Steven Johnson on November 23, 2008. He said that Cricket telephone records showed that Steven Johnson made two telephone calls the night of the murder, that Mr. Johnson called Robert Taylor at 11:55 p.m. looking for Ricky Allen, and that Mr. Johnson immediately hung up with Mr. Taylor and called Mr. Allen's telephone at 11:56 p.m. He said Mr. Allen was at home when he received Mr. Johnson's telephone call. He said that from 12:10 to 12:23 a.m., the Defendant's telephone used Tower BNA 158A. He said this information was important because Tower BNA 158A was 0.85 miles from Mr. Allen's location the night of the murder and because the information verified Mr. Allen's statement to the police. Mr. Johnson's telephone did not communicate with Tower BNA 158A from 12:10 to 12:23 a.m.

Detective Hafley testified that cell phone records showed that from 12:22 to 1:18 a.m., the Defendant "and others" were at Ink Gallery Tattoo parlor, the Express Market, Walmart, a family store, and a neighborhood store. He said that there were three towers in this vicinity

and that the Defendant's and Steven Johnson's telephones used these towers during that time. He said that the Defendant's telephone communicated with Tower BNA 077A at 1:28 a.m. and that Steven Johnson's telephone communicated with the tower closest to White Castle restaurant at the same time. He said the timing of the tower communications was important because Mr. Young called 9-1-1 at 1:30 a.m. He said that at 1:45 and 1:48 a.m., the Defendant's and Mr. Johnson's telephones used Tower BNA 095A near Mr. Johnson's home. He said that the Defendant's telephone communicated with Tower BNA 077A at 10:23 p.m. and 1:28 a.m. and that the last communication was two minutes before the 9-1-1 call.

On cross-examination, Detective Hafley testified that he did not know the number of fingerprints lifted from the victims' home or submitted for processing. He said that two fingerprints were taken from the rear screen door but that the fingerprints were "unidentifiable" because of poor quality. He said fingerprints were taken from the vehicles outside the home. He agreed that none of the fingerprints were identified.

Detective Hafley testified that he did not watch the officer make shoe print casts but that he saw the photographs of the procedure. He did not request the shoe print casts be analyzed by the TBI. He said the broken glass and window were collected as evidence and submitted to the TBI for DNA analysis. He said that the Defendant's DNA was submitted to the TBI for comparison but that no DNA was found on the window or broken glass.

Detective Hafley testified that a photograph lineup was presented to George Young by Detectives Brian Brown and Brian Myatt. He explained the composition of a photograph lineup but said he could not recall if the photographs were black and white. He agreed that Mr. Young identified a photograph of James Earl Walker and that Mr. Young said he was 100% sure that Mr. Walker was one of the men he saw standing at the back door the night of the murder. He said Mr. Young did not make an immediate identification of Mr. Walker. He said that because Mr. Young only saw the man from the eyes to the chin, the foreheads of the men in the photographs were covered. He said there was no indication that Mr. Walker was involved in the robbery or murder.

Detective Hafley testified that he contacted two motels on Trinity Lane to determine if Mr. Smith had been a guest. He agreed he contacted Roadway Inn and obtained a copy of the guest log from November 22, 2008. He could not recall the name of the second motel he contacted but said he was unable to find a motel room registered under the names of Norman Smith or Elexis Dawn Andrews, also known as Little Bit.

-15-

Detective Hafley testified that numerous cartridge casings were found in the victims' home and that projectiles fired from the cartridges were also found. He agreed the police did not recover a handgun. He said the bullet fragments left at the scene were deformed, "mushroom-shaped," and difficult to compare. He agreed the TBI did not analyze the projectiles to determine if they came from a .40 caliber semiautomatic handgun. He agreed that after the medical examiner removed the bullet from the victim, the police took possession of it. He said that only bullet fragments remained and that the TBI did not analyze the fragments.

Detective Hafley testified that footprints were found in a sandy area outside the victims' home that were similar to the shoe prints on the back door. He agreed that there were numerous people at the scene, including emergency medical personnel, firefighters, and police officers and that he wanted to ensure the footprints in the sand and on the door were not from people responding to the 9-1-1 call. He agreed emergency personnel were asked to preserve their shoes for comparison with the footprint cast. He said he did not know if anyone compared their shoes with the cast but said he knew police officers and firefighters were not allowed to wear tennis shoes while on duty.

Detective Hafley testified that he interviewed Mr. Allen in January 2009, and that Mr. Allen told him that he agreed to travel with Steven Johnson to the robbery. He said he found ledger notebooks in the victims' home with names and dollar amounts. He said an entry was made in the notebook on November 21, 2008, which showed a loan in the amount of $6640 to someone named Pete.

Adele Lewis, a forensic pathologist and assistant medical examiner, testified that although she did not perform the victim's autopsy, she reviewed the findings of the medical examiner who performed the autopsy and agreed with the physician's conclusions. A copy of the autopsy report was received as an exhibit. She said that the victim was shot in the middle of the forehead and that the wound was approximately three inches long. She concluded that the person who fired the gun was approximately three feet from the victim, that the victim died as a result of the gunshot wound, and that the death was a homicide. On cross-examination, Dr. Lewis testified that the victim was sixty-two years old, was seventy inches tall, weighed 293 pounds, and had multiple health problems. On redirect examination, Dr. Lewis testified that the victim's health problems did not interact with the gunshot wound.

Upon this evidence, the Defendant was convicted of felony murder, attempt to commit especially aggravated robbery, aggravated burglary, aggravated assault, and employment of a firearm during commission of a dangerous felony and received an effective sentence of life imprisonment plus eighteen years. This appeal followed.

-16-

# I

The Defendant contends that the evidence is insufficient to support his conviction for attempt to commit especially aggravated robbery because it rests upon the uncorroborated accomplice testimony of Ms. Barber and Mr. Allen. The State contends the evidence is sufficient to support the Defendant's conviction. Although the State concedes that Ms. Barber was an accomplice, the State argues that Mr. Allen was not an accomplice. We agree that Mr. Allen was not an accomplice and that the evidence is sufficient.

Especially aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" which includes the use of a deadly weapon and where the victim suffers serious bodily injury. See T.C.A. §§ 39-13-401(a), 39-13-403(a)(1),(2) (2010). Criminal attempt is defined as acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step towards the commission of the offense.

T.C.A. § 39-12-101(a) (2010).

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1991)). Our supreme court has stated that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)); see Sherrill v. State, 321 S.W.2d 811, 814 (1959). This means

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction, it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); see Shaw, 37 S.W.3d at 903 (citations omitted). The jury determines "the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient 'if there is some other evidence fairly tending to connect the defendant with the commission of the crime.'" State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (quoting Clapp v. State, 30 S.W. 214, 217 (Tenn. 1895)).

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the "credibility of the witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008) (citing State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007)); see State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Ms. Barber admitted on cross-examination that she was part of the plan to commit the robbery and that she assisted in the robbery by allowing the Defendant and Ricky Johnson to use her truck in exchange for a portion of the proceeds. She testified that she, Wendy Johnson, Steven Johnson, Ricky Johnson, and the Defendant met in the Walmart parking lot and discussed robbing the victims. She said the Defendant agreed to go in the victims' home to get the victims' money. She waited at a White Castle restaurant with Steven and Wendy Johnson while the Defendant and Ricky Johnson went to the victims' home to rob the

victims. We conclude that Ms. Barber was an accomplice and her testimony required independent corroboration. We note that the trial court instructed the jury that Ms. Barber was an accomplice and that her testimony alone could not convict the Defendant and that the other evidence must "independently lead to the conclusion that a crime was committed and that the Defendant was involved. . . ."

With regard to Mr. Allen, the Defendant argues that he was an accomplice as a matter of law. Mr. Allen testified that the Defendant and Steven and Ricky Johnson came to his home to discuss the robbery of two old men with a box of cash. The Defendant stated that Mr. Allen's job was "to stand there holding a gun, don't let nobody get to him" and that the Defendant's job was to get the money from underneath the victim's bed. Mr. Allen understood the plan was to take the money by force. After discussing the plan for the robbery, Mr. Allen told the men to call him one hour later, which was his way of telling the men that he was not going to participate. Mr. Allen left his home, went to a tattoo parlor, and gave his sister-in-law instructions to tell the men when they called that he said, "No." Mr. Allen, however, told Detective Hafley that he first agreed to travel with Steven Johnson to the robbery.

The record reflects that Mr. Allen did not participate in the robbery either directly or indirectly. Although Mr. Allen told the detective that he agreed to travel with Mr. Johnson to the robbery, there is no evidence that Mr. Allen traveled to the victims' home or knowingly, voluntarily, and with common intent united with the Defendant in the commission of the robbery. See Anderson, 985 S.W.2d at 16. We conclude that Mr. Allen was not an accomplice, that his testimony did not require independent corroboration, and that the evidence was sufficient to sustain the Defendant's conviction. The Defendant is not entitled to relief.

## II

The Defendant contends that the trial court erred by admitting statements made by co-defendants Steven and Ricky Johnson into evidence at the trial. He argues the statements were inadmissible hearsay under the co-conspirator hearsay exception because they were not made during the course of and in furtherance of the conspiracy. The State contends that the statements were properly admitted by the trial court as co-conspirator exceptions to the hearsay rule. We agree with the State that the Defendant is not entitled to relief.

Hearsay is an out-of-court statement offered in court "to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). However, Tennessee Rule of Evidence 803(1.2), provides

Hearsay Exceptions.- The following are not excluded by the hearsay rule:

. . . .

(1.2) Admission by Party-Opponent.-A statement offered against a party that is (E) a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy. . . .

"A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act . . . ." State v. Alley, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997) (citing State v. Lequire, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981)); see T.C.A. § 39-12-103(a) (2010). A conspiracy must be shown by a preponderance of the evidence. State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993). A conspiracy can be shown by "an implied understanding between the parties," circumstantial evidence, and the conduct of the parties. State v. Gaylor, 862 S.W.2d at 553; Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). For a statement to be admissible as a statement as a co-conspirator, the State must prove by a preponderance of the evidence : "1) that there is evidence of the existence of a conspiracy and the connection of the declarant and the defendant to that conspiracy, 2) that the declaration was made during the pendency of the conspiracy; and 3) that the declaration was made in furtherance of the conspiracy." State v. Henry, 33 S.W.3d 797, 803 (Tenn. 2000); Stamper, 863 S.W.2d at 406.

Our supreme court has said,

> For a statement of the co-conspirator to be admissible it must have been made "during the course of" the conspiracy which means that the conspiracy must have been ongoing at the time the statement was made. If the conspiracy had not yet begun or had ended when the statement was made, the declaration is not admissible under this hearsay exception, although it may still be admissible under some other exception. . . ."

State v. Walker, 910 S.W.2d 981, 385 (Tenn. 1995) (citing Tenn. R. Evid. 803(1.2)(E)) (emphasis added). The supreme court has also stated that "there is no bright-line test or precise definition for determining whether a statement has been made during the course of the conspiracy." Henry, 33 S.W.3d at 803 (citing Walker, 910 S.W.2d at 385-86).

The Defendant argues that Mr. Allen's testimony that Steven Johnson asked him if "he want[ed] to hit a lick," that the phrase meant to do something to make money, and that

Mr. Johnson asked him to participate in the robbery were inadmissible under the co-conspirator hearsay exception because they were made before the conspiracy began. The record reflects that the Defendant, Steven Johnson, and Ricky Johnson met Mr. Allen to recruit his assistance in the home invasion. Mr. Johnson asked Mr. Allen if he wanted to "hit a lick," something Mr. Allen said was to make money. In discussing the plan to take the victims' money, the Defendant told Mr. Allen that his job was to hold the gun and not let the victims get to the Defendant. Mr. Allen did not know where the robbery was going to take place, but he knew the plan was to take the money by force from two elderly men, who had a box of cash. He said that although the Defendant did most of the talking about the plan to get the money, Mr. Johnson asked him to participate in the robbery. The Defendant told him that the Defendant would get the money from the shoe box that was underneath the bed. He was told the shoe box contained $60,000.

We conclude that the evidence establishes the existence of a conspiracy between the Defendant, Steven Johnson, and Ricky Johnson and that Steven Johnson's statements at issue were made during and in furtherance of the conspiracy. See Henry, 33 S.W.3d at 803; Stamper, 863 S.W.2d at 406. The Defendant and Steven and Ricky Johnson had already developed the plan, chosen the victims, and selected the place of the robbery before seeking Mr. Allen's assistance. The plan to take the victims' money by force was established before contacting Mr. Allen, and Mr. Johnson's request for Mr. Allen to participate in the robbery and his asking Mr. Allen if he wanted to "hit a lick" were made to elicit Mr. Allen's aid.

As for Mr. Allen's interpretation of the phrase "hit a lick," it was based on his personal knowledge of the meaning of the phrase and not a subject for the hearsay rule. Likewise, Mr. Allen's statement that he saw the news the morning after the home invasion and "made his own assumptions" was not a subject for the hearsay rule. Mr. Allen testified that based on his conservation with the Defendant and Mr. Johnson, he drew his own conclusions after watching the morning news. The statement contained Mr. Allen's mental impressions and did not contain hearsay.

The Defendant argues that Ms. Barber's testimony that Steven Johnson asked her if she wanted to make some money and that he told her about a robbery of a house with drugs and money was inadmissible under the co-conspirator hearsay exception because the statements were made before the conspiracy began. The evidence shows that Ms. Barber, the Defendant, Steven Johnson, Ricky Johnson, and Wendy Johnson met at the Walmart parking lot. Steven Johnson asked Ms. Barber if she wanted to make some money. Although she was not given the details of how the group was going to make the money, Steven Johnson told her about a robbery and drugs in a house. She agreed to allow the Defendant and the Johnson brothers to use her truck for the robbery in exchange for a portion of the proceeds.

Mr. Johnson statement to Ms. Barber was admissible because it was made in furtherance of the conspiracy. See Henry, 33 S.W.3d at 803; Stamper, 863 S.W.2d at 406. The evidence shows that although the plan for obtaining the money was not fully developed at the time Mr. Johnson asked Ms. Barber if she wanted to make some money, the plan was already in motion. The Defendant and Mr. Johnson had already developed the objective of the plan, chosen the victims, and selected the place of the crime before seeking the aid of Ms. Barber's truck. She said the Defendant agreed to go into the victims' home while the group discussed the plan in the Walmart parking lot and when the group met at Trinity Lane later that night, Ms. Barber said she knew a robbery was going to occur.

The Defendant argues that Ms. Barber's testimony that she overheard Steven Johnson on the telephone with Ricky Johnson and that Steven Johnson asked, "Was that gunshots?" was inadmissible under the co-conspirator hearsay exception. The evidence shows that Ms. Barber and Steven and Wendy Johnson waited at a White Castle restaurant while the Defendant and Ricky Johnson went to the victims' home to commit the robbery in Ms. Barber's truck. Ms. Barber testified that she remembered Steven Johnson being on the telephone with Ricky Johnson while they waited at the restaurant. She overheard Steven Johnson state, "Was that gunshots?"

We conclude that Mr. Johnson's statement, "Was that gunshots?," was subject to the hearsay rule and that it was made during the course of and in furtherance of the conspiracy. See Walker, 910 S.W.2d at 385. The evidence shows that John Young shot at the Defendant and Ricky Johnson after they forced their way into the victims' home. George Young testified that after he woke from being hit on the head with a pistol, he heard yelling and shooting. Likewise, Ms. Barber and Steven and Wendy Johnson waited at a restaurant for the Defendant and Ricky Johnson to return from the victims' home with the money. Because the Defendant and Ricky Johnson had not yet returned, the conspiracy was ongoing and the statement was made during the course of the conspiracy. Our supreme court has noted that a statement in furtherance of a conspiracy includes "updat[ing] other conspirators on the progress." State v. Carruthers, 35 S.W.3d 516, 556 (Tenn. 2000). Mr. Johnson's question was an attempt to gather information from his brother about what was happening at the victims' home and the progress of the robbery.

The Defendant argues that Ms. Barber's testimony that Ricky Johnson told her he was going to hide the gun was inadmissible under the co-conspirator hearsay exception because the conspiracy had ended. Our supreme court has stated that "[t]he commission of the offense . . . does not necessarily end the conspiracy, nor does it preclude the possibility that the conspiracy encompassed later statements regarding concealment of the offense." Henry, 33 S.W.3d at 803 (citing Walker, 910 S.W.2d at 38). A trial court should look to the totality

of factors and circumstances when determining the admissibility of evidence under the co-conspirator hearsay exception. Id.

The evidence shows that after Ms. Barber heard Steven Johnson ask if shots were fired, she saw her truck speeding past White Castle restaurant. Ms. Barber and Steven and Wendy Johnson got in Mr. Johnson's SUV and followed. The group drove to the Johnson family home. After both vehicles arrived at the home, Ricky Johnson told Ms. Barber that he was going to hide the gun used in the home invasion. Ms. Barber saw Ricky Johnson walk away from the house. Sometime later, Alicia Johnson woke to Steven and Ricky Johnson carrying the Defendant into the living room because of the cuts to the Defendant's leg. Ricky Johnson's statement could have been made during the conspiracy. The evidence does not preponderate against the trial court's finding that Ricky Johnson's statement was admissible under the co-conspirator exception.

The Defendant argues that Alicia Johnson's testimony that she overheard Steven Johnson talking to the Defendant about "hitting a lick" was inadmissible under the co-conspirator hearsay exception because it was made before the conspiracy was formed. The evidence shows that Ms. Johnson attended a church dinner with Steven and Ricky Johnson and the Defendant. While at the dinner, she overheard Steven Johnson talking to the Defendant about "hitting a lick." There is no further evidence related to this conversation because Ms. Johnson walked away after hearing "hitting a lick."

A logical inference taken from Mr. Johnson's statement is that he and the Defendant were in the early stages of planning the robbery. The statement, however, could also be interpreted as a simple, casual conversation about how they were going to make some money based on other witness testimony. Our supreme court has stated that a statement may be in furtherance of a conspiracy if it is "designed to get the scheme started" or to "develop plans." Carruthers, 35 S.W.3d at 556. In contrast, a casual conversation between "co-conspirators is not considered to be in furtherance of the conspiracy." Id. Although Ms. Johnson overheard only a small portion of the conversation, it occurred around dinner time the night of the robbery, before meeting with Mr. Allen, and before meeting with Ms. Barber and Wendy Johnson at the Walmart parking lot. We conclude that the evidence does not preponderate against the trial court's finding that the statement was admissible under the co-conspirator exception to the hearsay rule.

The Defendant argues that Alicia Johnson's testimony about Steven Johnson's statement "That's it," when she saw the news report about the robbery and murder was inadmissible under the co-conspirator hearsay exception. The evidence shows that after everyone arrived at the Johnson family home and the Defendant's leg wound was treated, they watched the morning news on television. Alicia Johnson said that Steven Johnson said,

"That's it," when he saw a news report about a robbery and murder. There was no evidence regarding Mr. Johnson's demeanor when the statement was made.

Although we conclude that Ms. Johnson's statement that she saw a news report about a robbery and murder was not a subject of hearsay rule because it contained her personal knowledge about what she saw, we conclude that Mr. Johnson's comment was subject to the rule but that it was not made during or in furtherance of the conspiracy. Although the shooting occurred around 1:30 a.m., the statement was made at 5:00 or 6:00 a.m. and after everyone arrived at the Johnson family home. By that time, any attempt to take the victims' money had been abandoned and everyone had time to reflect upon the night's events. The conspiracy had ended. See State v. Hutchinson, 898 S.W.2d 161, 170 (Tenn. 1994) (stating that "a conspiracy continues until the conspirators' ultimate goal of collecting the proceeds of the crime has been . . . abandoned"). Likewise, there is no evidence that the statement was made in furtherance of the conspiracy. Mr. Johnson was watching the news, presumably to determine if the police were investigating the shooting. Because the statement was not made during and in furtherance of the conspiracy, the trial court erred in admitting the co-conspirator's statement. We also conclude, though, that the error was harmless in light of the strong evidence of the Defendant's guilt. See Walker, 910 S.W.2d at 386. We cannot conclude that the error "more probably than not affected the judgment." See T.R.A.P. 36(b). The Defendant is not entitled to relief.

### III

The Defendant contends that the trial court erred by failing to redact a statement made by co-defendant Steven Johnson to the police from a telephone recording played at the trial. He argues that the error violated his right to confront Mr. Johnson under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, section 9 of the Tennessee Constitution. The State contends that the trial court did not err by failing to redact Mr. Johnson's statement because the Defendant adopted Mr. Johnson's statement or expressed a belief in its truth under Tennessee Rule of Evidence 803(1.3)(B). The State argues the recording does not implicate the Confrontation Clause. We agree with the State.

At a pretrial hearing, the Defendant objected to the State's playing a telephone call between the Defendant and Steven Johnson, which contained the Defendant's reading Steven Johnson's police statement. The telephone call was made after the Defendant received the State's discovery package. The Defendant told Mr. Johnson that he read Steven Johnson's statement, and Mr. Johnson asked about the statement's contents. The Defendant read Mr. Johnson's statement, which said,

-24-

Dwayne Vaughn . . . asked Wendy E. Johnson if she knew anyone who would do a robbery of the victims. Wendy contacted [Steven Johnson] and asked him to meet Dwayne. [Steven Johnson] met Dwayne and listened to the idea. [Steven Johnson] told him no. However, [inaudible] and [the Defendant began] to talk about the robbery, and [Steven Johnson] helped [the Defendant] try to find others to help [the Defendant]. [Steven Johnson] got his brother to go with them. [Steven Johnson], [the Defendant], and [Ricky] Johnson . . . drove to the victims' home to commit a robbery. [The Defendant] and [Ricky] Johnson walked to the victims' home from the church parking lot at Jones-Trinity . . . however, the victims would not let them in and [Ricky] Johnson refused to go in the house. . . .

[Steven Johnson] called Robert Taylor looking for . . . [Ricky] Allen. Taylor gave [Steven Johnson] the phone number to reach Allen. [Steven Johnson] was driving his red Chevy Tahoe and was with [the Defendant] and [Ricky] Johnson when they met Allen. . . . There, Allen agreed to join the robbery. However, Allen later told them [he would not] participate in the robbery. [Steven Johnson] then drove [the Defendant] and [Ricky] Johnson to at least one location looking for . . . [someone] known only as Red. [Red] declined. [Steven Johnson], [the Defendant], and [Ricky] Johnson then went to Ink Gallery Tattoo shop and borrowed a small . . . pickup truck from a female known only as Gail. Gail [was] a friend of Wendy Johnson. Wendy gave [Ricky] Johnson her cell phone to use during the robbery. [The Defendant] and [Ricky] Johnson drove to the victims' home in Gail's truck and [Steven Johnson] followed them in his Tahoe. [Steven Johnson] was on the phone with [Ricky] Johnson while [the Defendant] was inside the victims' house. [Ricky] Johnson told [Steven Johnson] that he heard two different guns firing from where [the Defendant] was. [Ricky] Johnson drove around until he found [the Defendant] walking in the area just north of the victims' home. [Steven Johnson] did not know where or how [the Defendant] got the gun that he used and did not know what happened to it after the robbery murder. Dwayne was supposed to get fifty percent of the money. [Steven Johnson] was supposed to get [$10,000]. [The Defendant] and Rick[y] Johnson

were supposed to split the rest. [Steven Johnson] didn't want any money for his in November 2008 efforts. . . .

Steven Johnson told the Defendant the statement was "bogus," and he and the Defendant argued about the contents of the statement. The Defendant asked how Mr. Johnson could "tell them all the business from A to Z?" Mr. Johnson denied telling the police "all the business from A to Z." The Defendant said, "you left out the bottom half. Anything that involved you, you left out."

The trial court found that the Defendant's adoptive statements of "how can you tell them all the business from A to Z," and "leaving out the part except for what you did and involvement of it" were not hearsay. The court found the remainder of the statement to be admissible hearsay as a statement by a co-conspirator but redacted Mr. Johnson's statement that said that "he declined to participate, so [the Defendant] then beat him up." The court also redacted the sentence from Detective Hafley's report that stated Mr. Johnson's "statements were corroborated by phone records and statements from other sources, A.D.A. Janice Norman was contacted and the decision to arrest [Mr. Johnson] was made. He is charged with conspiracy to commit especially aggravated robbery and criminal homicide." The court admitted the remaining portion of the Defendant's reading Mr. Johnson's statement.

Hearsay is an out-of-court statement offered in court "to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). However, Tennessee Rule of Evidence 803(1.2), provides

> Hearsay Exceptions.- The following are not excluded by the hearsay rule:
>
> . . . .
>
> (1.2) Admission by Party-Opponent.-A statement offered against a party that is (B) a statement in which the party has manifested an adoption or belief in its truth. . . .

The record shows that the Defendant did not dispute the accuracy of Mr. Johnson's statement to the police. The Defendant was angered only by Mr. Johnson's minimizing his role in the home invasion. We conclude that the Defendant adopted Mr. Johnson's statement to the police as truth. The trial court did not abuse its discretion in admitting the telephone conversation.

Although the Defendant also argues that the trial court's admitting the telephone call violated his confrontation rights under Crawford v. Washington, 541 U.S. 36 (2004), we disagree. In Crawford, the supreme court held that "where 'testimonial' evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68. The Court concluded that testimonial evidence "applies at a minimum to . . . police interrogations." Id. Although Mr. Johnson's statement to the police was testimonial evidence under Crawford, the Defendant did not dispute the substance of the statement, and thus, did not implicate the Confrontation Clause. See State v. Michelle Tipton, No. E2004-01278-CCA-R3-CD, Sevier County, slip op. at 10-11 (Tenn. Crim. App. Aug. 22, 2005) (holding that although the defendant's reading of co-defendant's statement was testimonial evidence, the Confrontation Clause did not apply because the defendant adopted the statement by stating that the co-defendant's statement was true). Because the Defendant did not dispute the factual content of the statement played for the jury, the Confrontation Clause was not triggered. The Defendant is not entitled to relief.

**IV**

The Defendant contends that the trial court erred by allowing the State to amend the indictment to include a greater offense than originally charged. He argues that the court erred by amending the possession of a firearm during a dangerous felony charge, a Class D felony, to employing a firearm during the commission of or attempt to commit a dangerous felony, a Class C, without his consent. The State responds that the trial court did not err by allowing the State to amend the indictment because the Defendant consented to the amendment. We agree with the State.

Before the trial began, the trial court said, "I understand that there's been some agreement about amending the indictment?" The prosecutor told the court "yes." The court stated that count two of the indictment, especially aggravated burglary, was dismissed and that counts three through five were renumbered two through five. The trial court also stated that amended count five changed from possession of a firearm during the commission of a dangerous felony to employment of a firearm. The State confirmed that the changes were correct, and when the court asked trial counsel if the changes were correct, counsel said, "My understanding, Your honor, yes." The matter was not discussed further. The amended indictment was read to the jury without objection.

The Defendant argues that the above exchange fails to show clear consent to the State's desire to amend the indictment. He also argues that "while it appears that [trial] counsel had an 'understanding' that the State desired to amend the indictment, such understanding may have been limited to the State's dismissal of count 2, and not the amendment to newly-renumbered count 5." He argues that any ambiguity in counsel's

-27-

statements should be resolved in his favor. The State contends that the record shows the Defendant consented to the amendment and argues that the record speaks for itself. We conclude that the Defendant agreed to the amendment.

Tennessee Rule of Criminal Procedure 7(b)(1) allows a trial court to amend an indictment with the consent of the defendant. Tenn. R. Crim. P. 7(b)(1). A defendant's oral or written consent, however, must be "clear from the record." State v. Stokes, 24 S.W.3d 303, 307 (Tenn. 2000). A court, however, may only amend an indictment without the consent of the defendant and before jeopardy attached "if no additional or different offense is charged and no substantial right of the defendant is prejudiced." Tenn. R. Crim. P. 7(b)(2).

The record reflects that the trial court asked trial counsel about an "agreement to amend" the indictment. The court read each of the amendments, which included the dismissal of count two, especially aggravated burglary, the renumbering of the remaining counts, and the change from possession of a firearm during the commission of a dangerous felony to employment of a firearm. The State confirmed the changes and when the court asked counsel if the State was correct, counsel said, "My understanding, Your honor, yes." After the State read the amended indictment, the Defendant pled not guilty. The record shows that counsel heard the amendments read by the court and confirmed the amendments for the court. Although the court took up the amendment issue with knowledge that an "agreement" was reached, counsel gave the court no indication that the Defendant objected. We conclude that the Defendant consented to the amendments.

## V

The Defendant contends that the trial court erred by allowing separate convictions for attempted especially aggravated robbery and aggravated burglary. He argues that the separate convictions violate double jeopardy principles. The State contends that the trial court did not err and argues that the convictions did not violate double jeopardy principles. We agree with the State.

Criminal attempt is where a person acts with the kind of culpability otherwise required for the offense:

> (1) Intentionally engaged in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believed them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstance surround the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101 (2010). Especially aggravated robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" achieved "with a deadly weapon" and "where the victim suffers serious bodily injury." T.C.A. §§ 39-13-401(a), 39-13-403(a). In relevant part, a person commits aggravated burglary who, without the effective consent of the property owner, enters a "habitation with the intent to commit a felony, theft or assault" or enters a habitation and "commits or attempts to commit a felony, theft or assault." T.C.A. §§ 39-14-402(a)(1), (3), 39-14-403.

The Defendant was convicted of attempted especially aggravated robbery against John Young and convicted of aggravated burglary against John Young and George Young. This court has stated that "offenses with different named victims would not be the same for double jeopardy purposes." State v. Jason D. Pillow, M2002-01864-CCA-R3-CD, Maury County, slip op. at 14 (Tenn. Crim. App. Feb. 27, 2004), perm. app. denied (Tenn. June 21, 2004). This court has also concluded that aggravated burglary and attempted especially aggravated robbery "are narrowly defined by statute and each contains different elements." State v. Cowan, 46 S.W.3d 227, 234 (Tenn. Crim. App. 2000). Although aggravated burglary is an offense against property and completed upon entry into a habitation, attempted especially aggravated robbery is an offense against the person and "focuses upon the intent to rob, a deadly weapon and serious bodily injury." Id. at 235-36. In other words, the two offenses are not the same for double jeopardy principles because each "requires proof of an element that the other does not." State v. Samuel L. Giddens, Jr., No. M2005-00691-CCA-R3-CD, Davidson County, slip op. at 14 (Tenn. Crim. App. Mar. 13, 2006) (citing Jason D. Pillow, slip op. at 14); see State v. Watkins, 362 S.W.3d 532 (Tenn. 2012) (holding that the same elements test in Blockburger v. United States, 284 U.S. 299, 304 (1932), is the applicable test in Tennessee for determining whether multiple convictions under different statutes constitute the same offense for double jeopardy principles). The Defendant entered the victims' home by kicking open the back door with the intent to commit a felony theft inside. After the Defendant entered the home by force, he committed a separate crime when he killed John Young while attempting to take Mr. Young's money at gunpoint. The Defendant is not

entitled to relief on this issue.

## VI

The Defendant contends that the trial court erred by imposing partial consecutive sentencing. He argues that the trial court's only finding that the Defendant was a dangerous offender was not sufficient for imposing consecutive sentences. The State contends that the trial court properly imposed partial consecutive sentences and argues that the record supports the sentence. We agree with the State.

At the sentencing hearing, certified copies of the Defendant's previous convictions for theft of property, a Class D felony, and robbery, a Class C felony, were received as exhibits. The record reflects that the Defendant was on probation at the time the instant offenses were committed and had prior convictions for public intoxication, prohibited weapons, vandalism up to $500, public indecency, unlawful drug paraphernalia uses and activities, assault, possession of narcotic equipment, two counts of possession of drugs, two counts of driving on a suspended license, two counts of domestic violence, and aggravated criminal trespass.

The State submitted a recording of two telephone calls the Defendant made to his mother while awaiting sentencing. In the first call, the Defendant told his mother, "I caught [Steven Johnson] loafing in the clinic." The Defendant said he was in the clinic soaking his foot when Mr. Johnson came into the clinic for a nail clipping. He said he got into an altercation with Mr. Johnson in which the Defendant stabbed Mr. Johnson in the neck five times. Although he did not know the extent of Mr. Johnson's injuries, he said he wished the "son of a b---- would die." He said Mr. Johnson spoke to him as though they were still friends even though Mr. Johnson talked to the police about the home invasion and murder.

In the second call, the Defendant told his mother that Mr. Johnson was not dying. The Defendant said that Mr. Johnson said hello to him in the clinic and that he told Mr. Johnson not to speak to him because he was "a snitchin' son of a b----." Mr. Johnson did not say anything further to the Defendant, sat down near correction officers, and clipped his nails. He said that there was an inmate talking about suicide in the clinic and that the guards were focused on his problems. The Defendant "did what he did" while the guards were distracted. He said another inmate tried to get between them but said he only stopped attacking Mr. Johnson when he heard the guard call the "code." He said that "he got in a couple more licks . . . and backed off" Mr. Johnson. He told Mr. Johnson, "I told you I was going to get you . . . ." He said that he threw the "shank" down when he heard the guards coming to prevent the guards from attacking him. The Defendant told his mother, "What's done is done and needed to be done." He said "he had to do what he had to do."

-30-

The trial court found that the Defendant was a Range II, multiple offender based upon his previous felony convictions for theft of property and robbery. The trial court refused to find that the Defendant committed the instant offenses to provide necessities for him and his family. The court recalled the Defendant's claiming that his actions were to put his family in "financial good-standing" but stated that while some of the proceeds would have paid debts and creditors, the "tone" was that the money was going to place the Defendant and his family "on easy street." The court found that there was no proof that the Defendant tried to steal in order to eat and that the Defendant had money to drink and used drugs routinely.

The trial court found that since the Defendant's instant convictions, he was indicted for the attempted first degree murder of his co-defendant Steven Johnson. The court found that based on the recording played at the sentencing hearing, the Defendant admitted to trying to kill Mr. Johnson and took pride in his actions. The court noted the Defendant's only regret was that Mr. Johnson survived the attack.

The trial court found that the Defendant's actions in this case and the pending attempted first degree murder case showed a clear disregard for the laws and morals of society. The court found the Defendant to be a dangerous offender whose behavior indicated little to no regard for human life and no hesitation about committing a crime where the risk to human life was high. The court found the Defendant struck one victim on the head, shot another victim, and continued to shoot after the Defendant was safely out of the home. The court found that an intent to violate the law motivated the Defendant's conduct with regard to the aggravated burglary and attempted especially aggravated robbery convictions. The court found that when the initial plan failed, the Defendant and his co-defendants retreated, regrouped, and forced their way into the home. The court found that the Defendant knew the victims were elderly men and that the Defendant's plan was premeditated.

The trial court found that "confinement for an extended period of time was necessary to protect the Defendant from his unwillingness to lead a productive life and his resort to criminal activity and furtherance of his anti-societal behavior." According to the judgments of conviction, the court ordered partial consecutive sentencing that resulted in an effective sentence of life imprisonment plus eighteen years. The court stated that the length of the sentence was reasonable in relation to the severity of the offenses committed.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are

relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

With regard to the trial court's imposition of partially consecutive sentences, the determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states, in pertinent part, that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

Our supreme court concluded that when a the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995); see State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

We conclude that the trial court properly imposed consecutive sentencing. The court found the Defendant was a dangerous offender whose behavior indicated little to no regard for human life and that the Defendant had no hesitation about committing a crime where the risk to human life was high pursuant to Tennessee Code Annotated § 40-35-115(b)(4). The Defendant planned the burglary and robbery of the victims. The court detailed the circumstances of the offenses, noted the Defendant's leadership role in carrying out the offenses, and discussed the Defendant's lack of hesitation in striking George Young in the head and rendering him "dazed," killing John Young, and continuing to shoot after leaving

the home. The Defendant expressed no remorse for killing Mr. Young and justified the shooting on the ground that the victim shot at him first. The record supports the trial court's finding that consecutive sentencing was reasonably related to the severity of the offenses. See Lane, 3 S.W.3d at 461.

The Defendant had numerous prior convictions. Before the sentencing hearing, the Defendant attempted to kill his co-defendant Steven Johnson. He admitted his guilt in two telephone conversations and expressed no remorse for his conduct. In fact, the Defendant's only regret was that Mr. Johnson survived. The court found that the Defendant was on probation at the time the offenses were committed and that he had a history of violating probation. As noted by the trial court, the Defendant failed to initiate self-efforts at rehabilitation even though he admitted to drug addiction, which reflects poorly on his amenability to rehabilitation. See State v. Bobby Blair, M2002-02376-CCA-R3-CD, Humphreys County, slip op. at 4-5 (Tenn. Crim. App. Dec. 5, 2003). When the initial plan failed to obtain the victims' money, the Defendant and his co-defendant forced their way into the home of two elderly men, rendering one dazed and killing the other. Confinement for an extended period of time was necessary to protect the public from the Defendant. The record supports the imposition of consecutive sentencing. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE